Randy P. LIGHT, Appellant (Defendant Below),

v.

STATE of Indiana, Appellee (Plaintiff Below).

No. 61S00-8709-CR-861.

Supreme Court of Indiana.

Dec. 15, 1989.

Transfer Denied March 20, 1990.

DeBruler, J., dissented and filed opinion in which Dickson, J., concurred.

Dickson, J., dissented and filed opinion in which DeBruler, J., concurred.

James A. Bruner, Rockville, for appellant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

A jury found appellant Randy P. Light guilty of murder, a felony. Ind.Code § 35–42–1–1 (Burns 1985 Repl.). The trial court sentenced him to the maximum term of 60 years in prison. We affirm.

When Cindy Lloyd Starr was last seen alive on August 27, 1986, she was with Randy Light. The two ventured to an area known locally as Fallen Rock, a heavily wooded area in Parke County across the county line from Brazil, Indiana.

Once there, they engaged in sexual intercourse. According to Light's responses during a tape-recorded interrogation, Light became enraged when Starr called him a "bastard" and other derogatory terms. Light reacted by striking Starr with an object resembling a tire iron. An autopsy revealed that Starr's death was caused by three crushing blows to her face and head.

The State presented the deposition of a truck driver who died before trial. The truck driver stated that he observed Light's brother, Gary, push the victim into a car earlier on the same day. Randy Light was already in the car. The three drove away. The truck driver said he observed that incident while following the truck route through Brazil. Pat Puff and Kimberly Snowden also saw Starr in this area at the same time.

The truck driver's testimony was contradicted by a defense witness, the former chief of police in Brazil. He testified that if the truck driver followed the truck route, the truck driver would not have passed the intersection where he claimed to have seen Gary Light force the victim into a car.

The victim's nude and partially decomposed body was found September 6, 1986, in a ravine in the Fallen Rock area. Her head, neck, upper back and arms were charred.

Light raises ten issues in this direct appeal, the most important one being admissibility of his own statement to the police.

## I. *Admissibility of Light's Statements*

■ Light argues that the trial court erroneously admitted inculpatory statements, violating his fifth amendment right against self-incrimination and his fourteenth amendment right to due process.[1] Light asserts that his statements made during custodial interrogation were not voluntarily given and therefore should have been excluded.

We review separately Light's voluntary waiver of his right to remain silent and right to counsel under the *Miranda* doctrine. Although Light argues these issues together, they are subject to separate analysis.[2]

■ In reviewing the voluntariness of statements made by defendants, courts look at the "totality of the circumstances." *Blackburn v. Alabama*, 361 U.S. 199, 206, 80 S.Ct. 274, 280, 4 L.Ed.2d 242, 248 (1960). Unlike the standard appellate review of sufficiency of the evidence, the standard of review for the voluntariness of confessions takes into consideration the total record. *See id.* Customarily a review for sufficiency of the evidence only looks to the evidence favorable to the verdict. *Loyd v. State* (1980), 272 Ind. 404, 398 N.E.2d 1260, *cert. denied*, 449 U.S. 881, 101 S.Ct. 231, 66 L.Ed.2d 105. A review of constitutional voluntariness is not a factual issue but "a legal question meriting independent consideration ..." *Miller v. Fenton*, 474 U.S.

---

1. Light also cited art. 1, §§ 13 and 14 of the Indiana Constitution without providing any legal analysis. He thus waives the argument. *St. John v. State* (1988), Ind., 523 N.E.2d 1353 (failure to provide argument for independent standard waives state constitutional law issue).

2. As Justice O'Connor stated recently:
 The *Miranda* rule is not, nor did it ever claim to be, a dictate of the Fifth Amendment itself. The *Miranda* Court implicitly acknowledged as much when it indicated that procedures other than the warnings dictated by the Court's opinion might satisfy constitutional concerns, *See Miranda v. Arizona*, 384 U.S. [436], at 444 [86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966)], and what was implicit in the *Miranda* opinion itself has been made explicit in our subsequent cases. *See, e.g., Oregon v. Elstad*, 470 U.S. 298, 306–310

[105 S.Ct. 1285, 1291–1293, 84 L.Ed.2d 222] (1985) (noting that the *Miranda* rule 'sweeps more broadly than the Fifth Amendment itself' and 'may be triggered even in the absence of a Fifth Amendment violation'); *accord New York v. Quarles*, 467 U.S. 649 [104 S.Ct. 2626, 81 L.Ed.2d 550] (1984); *Michigan v. Tucker*, 417 U.S. 433, 442–446 [94 S.Ct. 2357, 2362–2365, 41 L.Ed.2d 182] (1974). Like all prophylactic rules, the *Miranda* rule 'overprotects' the value at stake. In the name of efficient judicial administration of the Fifth Amendment guarantee and the need to create institutional respect for Fifth Amendment values, it sacrifices society's interest in uncovering evidence of crime and punishing those who violate its laws. *Duckworth v. Eagan*, —— U.S. ——, 109 S.Ct. 2875, 2883, 106 L.Ed.2d 166 (1989) (O'Connor, J., concurring).

104, 115, 106 S.Ct. 445, 452, 88 L.Ed.2d 405, 414 (1985).[3]

■ A review of voluntariness of statements made during a custodial interrogation involves looking at all the evidence. *See Blackburn,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242. Among the considerations are the defendant's low level of intelligence, *Davis v. North Carolina,* 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966); inconsistencies in the defendant's statement, *Clewis v. Texas,* 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967); explicit or implicit promises by police interrogators, *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964); and the coercive nature of the interrogation atmosphere, *Blackburn,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242

■ The question presented is whether the trial court erred by admitting the statements. The trial judge must determine that a confession was freely and voluntarily given before allowing a jury to hear it, and the judge's "conclusion that the confession is voluntary must appear from the record with unmistakable clarity." *Sims v. Georgia,* 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593, 598 (1967).

■ Recent U.S. Supreme Court opinions focus on two areas of inquiry: 1) whether the alleged coercive police activity violated the U.S. Constitution and 2) whether the defendant's will was overborne by such coercive activity. Coercive police activity is a necessary prerequisite to finding a confession is not "voluntary" within the meaning of the due process clause of the fourteenth amendment. *Colorado v. Connelly,* 479 U.S. 157, 167, 107 S.Ct. 515, 522, 93 L.Ed.2d 473, 484 (1986). A review of the trial court's decision essentially examines the defendant's "will to resist," *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735, 741, 5 L.Ed.2d 760, 768 (1961),[4] which must not be overborne; nor can his "capacity for self determination [be] critically impaired." *Culombe v. Connecticut,* 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037, 1057–58 (1961). This analysis ultimately turns "on the effect of the totality of the circumstances on the defendant's will." *United States v. Ballard,* 586 F.2d 1060, 1062 (5th Cir.1978). It matters not whether the statement was true or false or even if there is ample evidence aside from the confession to support the verdict. *See Rogers v. Richmond,* 365 U.S. at 540–41, 81 S.Ct. at 739–40. What matters is only whether the statement would not have been given but for coercive government influences. *See Blackburn,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242.

Light argues that several factors militate against admitting his statements: Light's lack of experience in police procedures, the privacy of the interrogation room, coercive psychological techniques employed by police, false legal advice given, his lower than average intelligence and illiteracy, inconsistencies in his statements and the explicit

3. [T]he admissibility of a confession turns as much on whether the techniques for extracting the statements, as applied to *this* suspect, are compatible with a system that presumes innocence and assures that a conviction will not be secured by inquisitorial means as on whether the defendant's will was in fact overborne.... [T]he critical events surrounding the taking of a confession almost invariably occur in a secret and inherently more coercive environment. [T]ogether with the inevitable and understandable reluctance to exclude an otherwise reliable admission of guilt, they elevate the risk that erroneous resolution of the voluntariness question might inadvertently frustrate the protection of federal right. We reiterate our confidence that state judges, no less than their federal counterparts, will properly discharge their duty to protect the constitutional rights of criminal defendants. *Miller v. Fenton,* 474 U.S. at 117–16,

106 S.Ct. at 452–53, 88 L.Ed.2d at 414–16 (citations omitted) (emphasis in original).

4. "Our decisions under [the fourteenth amendment] have made clear that convictions following the admission into evidence of [involuntary confessions] cannot stand ... not so much because such confessions are unlikely to be true but because the methods used to extract them offend an underlying principle in the enforcement of our criminal law: that ours is an accusatorial and not an inquisitorial system.... Indeed, in many of the cases [reversing] state convictions involving the use of confessions obtained by impermissible methods, independent corroborating evidence left little doubt of the truth of what the defendant had confessed." *Rogers v. Richmond,* 365 U.S. at 540–41, 81 S.Ct. at 739–40, 5 L.Ed.2d at 766–67.

or implicit promises made to him by police. Under the totality of the circumstances, Light argues, these factors show that his statements were involuntary because his mental will was overborne by coercive police interrogation. Light cites various cases in support of his argument which describe scenarios that have caused courts to hold confessions involuntary: *Davis v. North Carolina*, 384 U.S. 737, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966) (defendant with third- or fourth-grade intelligence level not advised of *Miranda* warnings held in solitary for 16 days and interrogated at least once each day taken on a 14–mile hike while handcuffed to police on the 16th day when he confessed); *Bram v. United States*, 168 U.S. 532, 580, 18 S.Ct. 183, 42 L.Ed. 568 (1897) (police stripped defendant of his clothing and induced confession by asking a question that would imply guilt no matter the answer); *Clewis v. Texas*, 386 U.S. 707, 87 S.Ct. 1338, 18 L.Ed.2d 423 (1967) (defendant with no prior experience with police procedures, given no *Miranda* warnings held for 38 hours of intermittent interrogation, impaired by inadequate food, sleep and sickness, given several polygraph tests and taken on a trip to the grave site by police). He also cites *Smith v. State* (1969), 252 Ind. 425, 249 N.E.2d 493, a case in which admission of the defendant's statement was upheld. Smith, a 26–year-old man with an eighth grade education and no previous arrest record, was in contact with police ten hours and confessed while holding a Bible telling officers somebody was healing him.

 The entire interrogation of Light lasted approximately four hours. Only a portion of it was tape recorded. Before the tape-recorded statement, Sheriff Wayne Lucas, Officers Doug Smiley and Mike Lankford and Deputy Charles Jones each observed or participated in part of the interrogation. Deputy Jones testified: "... Wayne was asking most of the questions. Then if he didn't like the answer he stormed out of the room and come [sic] back in and then he would blurt it out some more and then [sic] got a little bit heated and out of control so I decided to leave. I was there about fifteen minutes." Police

Officer Eugene Hardman testified that when he arrived at the Clay County Sheriff's Department, Wayne Lucas said about the initial interrogation of Light: "We've torn down two of his alibis and there's one more to go." It is Clay County procedure to file a *Miranda* statement sheet after a suspect is read his rights. Police officers testified that they gave Light *Miranda* warnings before questioning him but were unable to produce a record of doing so. The record does demonstrate that Light was read his rights before the tape-recorded interrogation.

Light dropped out of school at age 15 and was enrolled primarily in a special education curriculum. He was 28 years old at the time of the trial. Light said in the statement he was drowsy during the tape-recorded interrogation. At several points, Officer Hardman audibly smacked Light's arm, ostensibly to keep Light alert. Hardman also used the technique of persistently positing Light's guilt in every question. He also repeatedly stated to Light: "I can't help you unless you tell us what happened. I want to help you...." On cross-examination by Light's attorney, Officer Hardman admitted lying to Light:

Q. You allowed him to believe that you knew more than you did?

A. I allowed him to believe that we had a lot of evidence.

Q. In fact you deceived him, didn't you?

A. Deceived him in which way?

Q. Well you recall some conversation about a letter?

A. Correct.

Q. There was a letter that Randy told you ... that his brother, Gary had a letter that had ... that knew of a girl who had a letter with the person who did this's (sic) name on it, didn't you?

A. That's correct.

Q. And you told him that you knew about that letter?

A. Yes.

Q. That letter never existed, did it?

A. No, it did not. That's the point that the defendant broke.

While Light's case resembles in some respects cases in which confessions have been suppressed, there are important factual differences. As opposed to cases where the statements by a suspect during a custodial interrogation were held involuntary, the police in this case interrogated Light for only four hours. In most of the cases where the statements were held involuntary, the interrogation lasted for a matter of days, not hours. The promises made by Officer Hardman were not specific promises of legal assistance but generalized offers.

Light's assertion of mental slowness has been neither doubted nor disproven, but the evidence revealed sufficient intelligence to pass a driver's test, hold a full-time job as a truck driver for twelve years, and support a wife and five children. The defense did not offer any evidence which would support Light's statement that he was functionally illiterate, although one police officer testified that Light told him he could not read or write. On the other hand, Light's ability to pass an Indiana driver's license test points in the other direction. Officer Hardman did make physical contact with Light, but from the transcript and the tape recording, it seems to be just what it was described to be—a mild smack or tap on the arm to keep him alert. Labelling the fifteen or so touches on the arm as "physical force or violence" is not a legitimate characterization. The nature of the physical contact between the interrogator and his subject naturally varies, and varying physical contacts should tell us different things about the effects of the contact on the interrogation. A slap in the face, for instance, would suggest something different than a smack on the arm while the subject is yawning, especially when the subject talks straight through it. The interrogating officer did admit to lying to Light. We do not condone such tactics, and they must be considered as evidence against voluntariness. *See generally* White, *Police Trickery in Inducing Confessions,* 127 U.Pa.L.Rev. 581–90, 599–600, 628–29 (1979). On the other hand, as Justice Thurgood Marshall has written for the U.S. Supreme Court, the relevance of such evidence does not mean that it compels a finding of constitutional violation. *Frazier v. Cupp,* 394 U.S. 731, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969).

Finally, the "totality of the circumstances" test is meant to keep the inquiry focused on the entire interrogation, not any single act by police or condition of the suspect. In the end, we must judge whether the police conduct in relation to the specific suspect was overbearing. After reviewing these tapes and transcripts, we find the evidence substantially supports the trial court's determination that Light's statement was voluntary. While there was considerable evidence to the contrary, we are not persuaded that the trial court erred by admitting Light's statements under the fifth and fourteenth amendments of the U.S. Constitution.

■ Next, we examine Light's argument that he did not knowingly, voluntarily and intelligently waive his right to remain silent or his right to counsel. Knowing, voluntary and intelligent waiver of these rights is required before the statements may be properly admitted. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Light points to the same facts to support this argument as he did to support his claim that his statements were given involuntarily.

■ The standard of review for waiver of *Miranda* rights is that the State must prove waiver by a preponderance of the evidence. *Colorado v. Connelly,* 479 U.S. at 168–69, 107 S.Ct. at 523, 93 L.Ed.2d at 485. This is a lower standard than for proof of voluntariness of a statement given to police during an interrogation. *See Blackburn,* 361 U.S. 199, 80 S.Ct. 274, 4 L.Ed.2d 242. Waiver may be inferred from the actions and words of the person interrogated. *North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979). The analysis begins with a presumption that the defendant did not waive his *Miranda* rights, and the State must carry the burden of proof. *Tague v. Louisiana,* 444

**1080**

U.S. 469, 100 S.Ct. 652, 62 L.Ed.2d 622 (1980). While Light relies on the same facts supporting his voluntary confession claim, a *Miranda* voluntary waiver analysis affords a different weight to some events than the voluntary statement analysis does. The police testimony that Light was read his rights and understood them before *any* interrogation commenced—recorded or unrecorded—and that Light consented to be interviewed (while relinquishing his constitutional right to counsel and silence) is adequate to support the trial court's finding that Light waived his *Miranda* rights. *People v. Parks*, 48 Ill.2d 232, 269 N.E.2d 484 (1971), *cert. denied*, 404 U.S. 1020, 92 S.Ct. 692, 30 L.Ed.2d 669 (1972); A Model Code of Pre-Arraignment Procedure § 130.4 note 4 and accompanying text (1975).

## II. *Corpus Delicti*

Light argues that the trial court erred by admitting Light's inculpatory statements without a sufficient showing of *corpus delicti* by the State.

A crime may not be proven solely on the basis of a confession. We require some other proof of the crime, in order to prevent confessions to crimes which never occurred. *Smith v. State* (1975), 167 Ind. App. 428, 339 N.E.2d 118.

Dr. Dean Hawley, a forensic pathologist, testified that "the remains of Cindy Starr show in the bones a series of injuries, the pattern of which leads us to the direct conclusions of cause of death." Dr. Hawley also testified that three skull injuries to the victim were fatal. He stated that those type of injuries indicated a hammer, a General Motors tire tool or a large rock.

Light asserts that this testimony was inadequate because the doctor did not specifically state that his opinions were based on reasonable medical certainty, citing *Palace Bar, Inc. v. Fearnot* (1978), 269 Ind. 405, 415, 381 N.E.2d 858, 864 (doctor's statement that a certain conclusion is possible is "no evidence at all"). We see no tentativeness in Dr. Hawley's opinions.

His testimony adequately established *corpus delicti.*

## III. *Motion for Mistrial*

Light argues that the trial court erred by denying his motion for mistrial when Officer Hardman violated an order in limine by testifying that Light "had a reputation for being violent with his wife." Light says this violation was especially harmful because sudden heat was an issue at trial. The court sustained Light's objection and admonished the jury to disregard that testimony.

The granting or denial of a motion for mistrial rests with the sound discretion of the trial court. *Jones v. State* (1978), 269 Ind. 543, 381 N.E.2d 1064. The court should grant a mistrial if the violation wrongly places the defendant in grave peril. *Blood v. State* (1980), 272 Ind. 417, 398 N.E.2d 671. We will reverse only for manifest abuse of its discretion on this issue.

Light's inculpatory statements, which were properly admitted, contained evidence of similar character. At several points in the tape recording of Light's statements, he admits to a problem controlling his anger. "I just loose control," he stated, "I can't ... I don't know, when my temper goes I can't ... I don't know what I'm doing." With this information already before the jury, it was within the discretion of the trial court to deny a motion for mistrial based on Officer Hardman's single violation.

## IV. *Gruesome Photographs*

Light argues that the trial court erred by admitting State's exhibits 6, 8, and 9. He contends that they were gruesome and cumulative, failed to provide any additional assistance, and had the singular effect of arousing the emotions of the jury.

These photographs of the victim's body where it was discovered are repulsive, as the State readily admits. They show a nude and charred body, badly decomposed after having laid on damp, heavily wooded grounds for ten days in late summer.

Admission of photographs is within the trial court's sound discretion and will not

be reversed unless the trial court abused its discretion. *Wilson v. State* (1978), 268 Ind. 112, 374 N.E.2d 45. Mindful that revolting crimes generate revolting evidence, we conclude that admission of just three photographs revealing the reality of the offense was not error.

## V. *Instruction No. 5*

 Light argues that the trial court erred by giving the jury final instruction no. 5:

> The intent to kill can be found from the acts, declarations, and conduct of the defendant at or just prior to the commission of the offense, from the character of the weapon used, and from the part of the body on which the wound was inflicted.

Light argues that the instruction was not supported by the evidence. For example, there was no evidence Light made any "declarations ... at or just prior to" the commission of the offense. He also claims that the evidence did not establish the "character" of the weapon used.

This instruction was a generally accurate statement of law. Dr. Hawley described the character of the weapon used and Light's statement supported his description. As for the absence of evidence about any declarations by Light at or just prior to the commission of the offense, we are satisfied that the jury was not confused by the surplusage in the instruction.

## VI. *Definition of Motive*

 Light argues that the trial court erred by giving the jury final instruction no. 4. It reads:

> The State is not required to prove that the accused had a motive—that is, some understandable reason—for committing the crime with which he is charged.

Light contends that defining "motive" as "some understandable reason" is a misstatement of law and tends to confuse the jury. This Court has described "motive" with those same words. *Bruce v. State* (1978), 268 Ind. 180, 256, 375 N.E.2d 1042, 1082, *cert. denied*, 439 U.S. 988, 99 S.Ct. 586, 58 L.Ed.2d 662. The trial court did not err in giving this instruction.

## VII. *Reasonable Doubt Instruction*

 Light asserts that the trial court erred by giving the jury final instruction no. 8. It reads:

> The Court further instructs you that you should not indulge in purely speculative doubts, and the bare possibility that the defendant may be innocent does not raise a reasonable doubt. The question of defendant's guilt must be determined by each of you in view of your obligation to act honestly and fairly in weighing the evidence and reaching a decision which your oaths impose.

Light argues that this instruction characterizes "reasonable doubt" as a "bare possibility." He asserts that it placed "undue influence upon the notion of speculation as to innocence." Further, Light states that reasonable doubt was adequately and properly defined by another instruction.

The trial court did give Indiana Pattern Instruction 11.01 on reasonable doubt, which would have been adequate. We do not agree that Instruction No. 8 characterizes "reasonable doubt" as a "bare possibility." If anything, it said the opposite. The instruction was proper.

## VIII. *Hearsay*

 Light asserts that the trial court erred by sustaining the State's hearsay objection to testimony by Light's witness, Donna Sarver. We reverse a trial court's hearsay ruling only if the court has abused its discretion. *See Emory v. State* (1981), Ind., 420 N.E.2d 883; *see also Payne v. State* (1987), Ind.App., 515 N.E.2d 1141. We will sustain the trial court if it can be done on any legal ground apparent in the record. *Cain v. State* (1973), 261 Ind. 41, 300 N.E.2d 89.

Light argues that the hearsay testimony should have been admissible for two reasons: first, the evidence was not offered for the truth of the matter asserted but to corroborate similar earlier testimony by Kimberly Snowden, and, second, the evidence was not offered for the truth of the matter asserted but to show the victim's state of mind.

Light, in effect, urges that because the State failed to object to earlier hearsay

when he elicited testimony from Kimberly Snowden, the State waived the right to object to later hearsay by Donna Sarver. Such a rule would allow litigants to piggyback into evidence all subsequent inadmissible hearsay once their own inadmissible hearsay was admitted.

 We also reject Light's argument that this hearsay was admissible because it falls under the state of mind exception, described in *Dunaway v. State* (1982), Ind., 440 N.E.2d 682, 686. In *Dunaway*, the Court held that otherwise inadmissible hearsay is admissible when testimony is not offered for the truth of the matter asserted but to show the victim's state of mind toward the defendant.

Light argues that Starr's state of mind was in issue to show she was "not afraid of whoever was waiting for her in the car." Light further contends that "the testimony of Sarver would be particularly relevant for this purpose as rebutting evidence presented by the State that Starr was forced into a car by Gary Light."

This argument fails because whether Starr was afraid of Gary Light, the defendant's brother, was not in issue. Certainly deciding whether this was in issue and therefore admissible under the state of mind exception was within the trial court's discretion.

### IX. *Sufficiency of the Evidence*

Light asserts that the State failed to sufficiently prove the *corpus deliciti*, that there was not sudden heat, the element of "knowingly," and any involvement of Light.

 First, as noted above, the State demonstrated *corpus deliciti*. Second, when sudden heat is in issue, the State must disprove its existence beyond a reasonable doubt. *Palmer v. State* (1981), Ind., 425 N.E.2d 640. The evidence favorable to the jury verdict is found in the sexual nature of Light's trip with Starr to the wooded area, his attempt to hide the crime, and the likelihood that Light chased the victim or carried her body from the scene of the killing. We conclude that the evidence permitted the jury to conclude that Light acted with the requisite culpability for murder and not under sudden heat.

 Third, the State carries the burden of proof on the "knowingly" element of murder. Intent to kill may be inferred from the use of a deadly weapon in a manner likely to cause death or great bodily harm. *Rhinehardt v. State* (1985), Ind., 477 N.E.2d 89. Three separate fatal blows were inflicted upon the victim, according to the forensic pathologist. The State met its burden.

 Fourth, Light argues that there is insufficient proof of his involvement "to any extent" because of Light's equivocal responses during his taped interrogation. We agree that many of Light's responses were equivocal. On the other hand, while Light's statements were the only direct evidence linking him to the crime, other circumstantial evidence connected him to it.

### X. *Sentence*

Light contends that the trial court's decision to impose the maximum sentence was manifestly unreasonable, given the evidence presented at sentencing. He argues the evidence showed three mitigators: 1) Light had never been arrested before, 2) Light was the sole supporter of his wife and five children, and 3) substantial evidence tended to show the offense was manslaughter or reckless homicide. Light also asserts that the court improperly considered the victim's physical disability and Light's greater physical strength, facts he claims were not supported by the evidence. Further, Light argues that the notion that he would commit future crimes was conjecture. He argues that no credible evidence demonstrates that Starr was struck three times. It shows only that she had three areas of injury, he says.

The trial court specifically stated that the aggravators outweighed the mitigators. The trial court cited three aggravators that supported the maximum sentence: (1) a lesser sentence would depreciate the seriousness of the crime (2) the victim was unable to escape because of a disability, and (3) the degree of violence involved in

the crime. We disagree with Light's arguments that the evidence does not support a finding that the victim had a disability. The victim's mother testified that the victim suffered from cerebral palsy. The evidence amply demonstrated that the offense was an extremely violent act.

 The trial court must state facts particular to the defendant and the crime when exercising its discretion to enhance a sentence. *Totten v. State* (1985), Ind., 486 N.E.2d 519. We find the court's imposition of the maximum sentence reasonable given the nature of the offense and character of the offender.

We affirm the judgment of the trial court.

GIVAN and PIVARNIK, JJ., concur.

DeBRULER, Justice, dissenting.

I deem myself bound to vote to reverse this conviction because of the erroneous admission of appellant's confessions. They were tape recorded at the tail end of a three-hour interrogation at the Clay County jail which commenced when appellant voluntarily appeared there in response to a request that he do so. That interrogation started out with an advisement and explanation of the privilege against self-incrimination and the right to counsel. Appellant acknowledged that he understood those rights and, as was the case in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), he then also refused to sign a written waiver of those rights. However, unlike the situation in *Butler*, the refusal here was not followed by a statement like "I will talk to you but I am not signing any form." *Id.*, at 371, 99 S.Ct. at 1756, 60 L.Ed.2d at 291. Instead, what followed so far as this record is concerned was an intensive hour or more of questioning in a small crowded room, punctuated by conduct of the interrogators involving cursing, falsifying of evidence, and conduct described by one of the officers as "out of control." Toward the end of this period of interrogation, appellant made seriously incriminating statements from which guilt could be inferred. It was not until this point that appellant was provided a new advisement of *Miranda* rights and signed a written waiver. This signing was followed by the tape recording of the confessions admitted at trial.

Appellant was very tired, lacking in experience with police procedures, and of lower than average intelligence, having been assigned to special education classes while in high school and never graduated. When one places him in the circumstances described in the above paragraph, no inference is warranted that appellant knowingly and voluntarily waived his privilege against self-incrimination and his right to counsel either from his conduct during the interrogation or from his belated signing of the waiver form after the coercive actions of his interrogators.

DICKSON, J., concurs.

DICKSON, Justice, dissenting.

I am deeply concerned that the majority opinion may be misread by some as condoning the use of force during police interrogation. If so, conduct which the majority today tolerates as a smack on the arm will be urged to justify tomorrow's slap in the face, or worse. Inquisitional interrogation, abominable under our system of justice, is absolutely intolerable.

I confidently expect that today's ruling will be a mere aberration, and that future decisions will steadfastly hold that resort to physical force or violence during police interrogation necessarily compels the exclusion of resulting evidence.

DeBRULER, J., concurs.