Michael D. COLLINS, Appellant–Defendant,

v.

STATE of Indiana, Appellee.

No. 27A04–0406–CR–339.

Court of Appeals of Indiana.

May 4, 2005.

Rehearing Denied June 27, 2005.

C. Robert Rittman, Grant County Public Defender, Marion, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Richard C. Webster, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

SULLIVAN, Judge.

■ Michael D. Collins was convicted by a jury of Murder, a felony;[1] Criminal Confinement, a Class B felony;[2] Abuse of a Corpse, a Class D felony;[3] Arson, a

---

1. Ind.Code § 35–42–1–1 (Burns Code Ed. Repl.2004).

2. Ind.Code § 35–42–3–3 (Burns Code Ed. Repl.2004).

3. Ind.Code § 35–45–11–2 (Burns Code Ed. Repl.2004).

Class D felony;[4] and Pointing a Firearm, a Class D felony.[5] After the presentation of additional evidence in both bifurcated and trifurcated proceedings, Collins was found guilty of Possession of a Firearm by a Serious Violent Felon, a Class B felony,[6] and was found to be a Habitual Offender.[7] He presents several issues for our review, three of which we address in detail:

I. Whether the trial court erred in denying Collins's request for change of venue;

II. Whether a statement made by a witness who refused to testify should have been admitted; and

III. Whether certain photographic evidence should have been excluded.[8]

We reverse Collins's conviction for murder and remand for further proceedings.[9]

On April 17, 2003, Collins and Jerry Downs were at Downs's home drinking beer and Crown Royal. At some point, Collins attempted to locate his girlfriend Tabitha ("Tabby") at her residence. She was not there, but Michelle Jaynes and her boyfriend Kenneth Kendall, both of whom lived in the same building as Tabby, were there. Collins left without incident and returned that evening with Jerry Downs at approximately 9:00 p.m. Collins, Downs, Kendall, and Michelle drove around in Downs's truck in an effort to find Tabby but could not locate her. They returned to Michelle's residence, and Michelle and her boyfriend sat down to drink beer while Collins and Downs left. Collins or Downs later called Michelle and asked her and Kendall to come to Downs's home to party, which they did. While there, they continued to drink.

After Michelle and Kendall left, Collins and Downs followed them to Michelle's home and confronted them. Downs pointed a gun at Kendall while Collins searched for Tabby in Tabby's apartment. Collins then returned to Michelle's apartment and asked Rosetta Calhoun, who was babysitting Michelle's children, where Tabby was. Rosetta responded that she did not know. Rosetta left and the other four individuals

4. Ind.Code § 35–43–1–1 (Burns Code Ed. Repl.2004).

5. Ind.Code § 35–47–4–3 (Burns Code Ed. Repl.2004).

6. Ind.Code § 35–47–4–5 (Burns Code Ed. Repl.2004).

7. Ind.Code § 35–50–2–8 (Burns Code Ed. Repl.2004).

8. Collins also claims that the sentence he received for his convictions, 144 years incarceration, is tantamount to life without parole because he is forty-six years old. He argues that because the prosecutor did not file for life without parole pursuant to statute, the trial court may not sentence him to a term of years which is effectively that. Collins is mistaken in his belief that a sentence for a term of years and life without parole may effectively be the same. Life without parole is a specific sentence which is authorized by both Indiana Code § 35–50–2–8.5 (Burns Code Ed. Repl.2004) and Indiana Code § 35–50–2–9 (Burns Code Ed. Repl.2004) in specific instances and applies to sentencing an individual upon one count. In the present case, Collins received his sentence for the combination of several convictions. Furthermore, other than claiming his sentence is tantamount to life without parole, he has failed to explain why he should receive a lesser sentence. Consequently, this claim is without merit. We also note that because we have reversed his conviction for murder, the sentence is no longer one for 144 years, although he could receive that same sentence if he is convicted in a new trial.

9. Collins was found to be a habitual offender, and the sentence enhancement for it was tacked onto the sentence for murder. The reversal of the conviction for murder does not affect the validity of the habitual offender finding but does affect the sentence. The trial court is granted leave to apply the habitual offender enhancement to one of the remaining felony convictions.

went outside. Collins wanted Michelle to drive him around to look for Tabby, but Kendall took the keys because he did not want Michelle to drive. Collins then placed a gun to Kendall's head and accused him of knowing where Tabby was. At that time, one of Michelle's children came out on the porch, screamed at Collins to leave Kendall alone, and yelled for her mother. Collins told her to go back inside, which she did. Michelle then told Collins to leave Kendall alone, and she would take him to find Tabby. She then got into the driver's seat of a car with Collins in the front seat and Downs in the backseat.

Shortly thereafter, Michelle called Kendall and told him she loved him and asked him to look after her children. She and Collins then began to fight about the radio. Eventually, she was shot in the head by Collins and died of her injuries. Collins then took Downs to his home and got some gasoline from him. Collins drove the car to a remote area and set it on fire with Michelle's body inside. He then walked to a nearby train track where he was able to get on a train and ride it toward Marion.

In the meantime, Downs had called the police and reported the shooting. Officers responded and learned the identity and description of Collins. Collins was apprehended while walking from the rail yard where he exited the train. He had a large amount of blood on his clothing and skin. The blood was tested and determined to be Michelle's. Collins gave a statement in which he admitted shooting Michelle but stated that it was an accident. Collins was ultimately charged with the counts for which he was convicted.

## I

### Change of Venue

▮ Collins asserts that the trial court erred in denying his request for a change of venue. The right to an impartial jury is at the heart of the decision on a change of venue motion. *Ward v. State,* 810 N.E.2d 1042, 1048 (Ind.2004), *reh. denied, cert. pending.* This right originates with the Sixth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, as well as Article 1, § 13 of the Indiana Constitution. *Id.* The criminally accused is guaranteed a fair trial by a panel of impartial, indifferent jurors. *Id.* at 1049.

▮ A trial court's denial of a motion for change of venue is reviewed for an abuse of discretion. *Id.* An abuse of discretion does not occur where voir dire reveals that the seated panel was able to set aside preconceived notions of guilt and render a verdict based solely upon evidence of guilt. *Id.* To show an abuse of discretion, the defendant must demonstrate the existence of two distinct elements: (1) prejudicial pretrial publicity and (2) the inability of jurors to render an impartial verdict. *Id.*

▮ Jurors need not be totally ignorant of the facts involved in order for a defendant to receive a fair trial. *Id.* Thus, a juror's mere exposure to press coverage is not enough to support a claim that local prejudice entitles a defendant to a change of venue. *Id.* Even if jurors have been exposed to pretrial publicity, that alone is insufficient to establish prejudice unless the jurors were unable to set aside any preconceived notions of guilt and render a verdict based upon the evidence. *Id.*

In establishing the facts in *Ward,* our Supreme Court noted the many newspaper articles which recounted the crime, as well as the shock and outrage of the community. The Court then quoted many excerpts from the transcript which revealed the pervasiveness of preconceived notions of guilt, including comments such as " '[H]e was caught at the site—I feel he's guilty.' " *Id.* at 1047. Other responses from poten-

tial jurors included that Ward should have been " 'hang[ed] ... instantly and he should have been shot on the spot at the scene of the crime' " and that prior opinions would make it difficult to be fair. *Id.* at 1046. The Court then held that the record established that the defendant had met the burden of proving that the jurors were unable to render an impartial verdict. *Id.* at 1050. The Court also noted the "disturbing" fact that one of the jurors admitted that she did not know if she was willing to base a decision solely on the evidence presented at trial. *Id.* Consequently, the Supreme Court remanded the cause for a new trial either with venue in a different county or with jurors from another county. *Id.*

In *Specht v. State,* 734 N.E.2d 239 (Ind. 2000), the facts revealed a much different picture of the impartiality of the jury. In that case, the potential jurors were questioned extensively about whether they could disregard pretrial publicity. The trial court excused all jurors who were unsure about their impartiality. The *Specht* Court held that the defendant had not demonstrated that the jurors impaneled were unable to be impartial due to the pretrial media coverage. *Id.* at 241. Thus, the trial court did not abuse its discretion in denying the motion for change of venue. *Id.*

In *Elsten v. State,* 698 N.E.2d 292 (Ind. 1998), the potential jurors were asked about their exposure to pretrial publicity and whether they could serve fairly and impartially. Five potential jurors were dismissed for indicating they could not. However, all of the impaneled jurors answered that they could function impartially to render a verdict based solely upon the evidence at trial. Because the defendant was unable to show any other evidence of prejudice arising from publicity, the Court concluded that his right to a fair trial was not denied. *Id.* at 294.

In the case before us, the potential jurors were questioned with regard to their impartiality. Our review of the transcript has not revealed any instances in which a juror who was unable to set aside preconceived notions of guilt was not excused from the jury. Likewise, Collins has not made such a showing. Rather, Collins asserts that the trial court prevented him from overcoming the presumption that a juror's voir dire is truthful by showing a general atmosphere of prejudice throughout the community. *See Brown v. State,* 563 N.E.2d 103, 105 (Ind.1990). Specifically, Collins asserts that the trial court should have allowed him to survey the jury through a blind questionnaire to determine if the jurors had preconceived notions which they would not likely espouse during voir dire.

 Criminal defendants have no absolute right to separately question a prospective juror outside the presence of other jurors. *Id.* As has been noted, "Individualized voir dire of prospective jurors may be required where the circumstances are highly unusual or potentially damaging to the defendant." *Id.* at 106. Collins asserts that this trial occurred in circumstances which were highly unusual or potentially damaging. However, he has failed to present any evidence which leads us to conclude that individual voir dire was required. The jurors chosen had either formed no opinions about the case before hearing the evidence or stated that they could put any opinions aside. Consequently, the trial court did not err in denying the request for a survey of the jury pool and in refusing to change the venue of the trial.

## II

### *Admission of Statement*

 Collins challenges the trial court's decision to allow a portion of a statement

made by Downs to be included within the taped statement of Collins which was played for the jury.[10] He asserts this was erroneous because Downs did not testify and thus was not available for cross-examination. As it did at trial, the State asserts that the statement was admissible under Indiana Evidence Rule 801(d)(2)(B) as a statement by a party-opponent because Collins manifested an adoption or belief in its truth.[11]

 The decision to admit or exclude evidence is a matter within the sound discretion of the trial court. *Swann v. State,* 789 N.E.2d 1020, 1023 (Ind.Ct.App.2003), *trans. denied.* When the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, an abuse of discretion has occurred. *Id.* We afford the decision to exclude evidence great deference upon appeal and reverse only when a manifest abuse of discretion denies the defendant a fair trial. *Id.* at 1023–24.

Indiana Evidence Rule 801(d)(2) states that a statement is not hearsay if it "is offered against a party and is .... (B) a statement of which the party has manifested an adoption or belief in its truth." The parties have not directed us to any Indiana case which has interpreted 801(d)(2)(B), nor has our research revealed the existence of such a case. However, Indiana's rule is identical to Federal Rule of Evidence 801(d)(2)(B). Accordingly, we may rely upon federal court cases for guidance.

Our research has resulted in locating one case with facts nearly identical to those here. In *U.S. v. Lilley,* 581 F.2d 182 (8th Cir.1978), the Court of Appeals was called upon to review the admission of a statement under 801(d)(2)(B). In that case, Lilley was convicted of several offenses related to the forgery of a check.[12] On August 24, 1977, Lilley was interviewed by Douglas Buchholz, a Special Agent of the United States Secret Service. She denied knowing anything about the check which had been forged and cashed but indicated that her husband, George Lilley, may have been involved.[13] On September 1, 1977, George was interviewed and informed Agent Buchholz that Lilley had given him the check and asked him to sign it, that she took his hand and helped him write the signature, and that she cashed the check.

Agent Buchholz subsequently arranged a second interview with Lilley and relayed the statement of her husband. Lilley then made a written statement because she wanted to tell Agent Buchholz the way she remembered the events happening. *Id.* at 185. In that statement, she indicated that she had prior knowledge of the check but that she had not possessed it. Further, she indicated that while she and George were out drinking, he had been unable to cash a check so they went to several shops. George eventually decided to purchase a guitar and signed a check at the music

---

10. During the taped interview with Collins, the interrogating officer played for Collins a portion of an earlier taped statement made by Downs.

11. Our review of this issue is limited solely to a discussion of Evidence Rule 801 because the parties did not develop argument with respect to any other grounds for its admissibility.

12. The check was a tax refund check for a Clayton Meeks which had been sent to the home of a Pamela Yahola. From the evidence at trial, it appears that Lilley and Meeks had a child together.

13. The Court in *Lilley* acknowledged that Lilley referred to George as her ex-husband but that the evidence was undisputed that they were married at the time of the interview and trial. 581 F.2d at 185 n. 1.

shop. She claimed that she never received any money from the check.

Based upon these facts, the Court concluded that the testimony of Agent Buchholz concerning statements made by George and repeated by Agent Buchholz to Lilley should not have been admitted. *Id.* at 186. The Court concluded that despite Lilley's failure to expressly deny each and every portion of her husband's statement, she did state that she wanted to tell Agent Buchholz the way she recalled the incident. *Id.* at 187. Her written statement, given in response to George's statement, contradicted George's statement in nearly every material respect. *Id.* Specifically, the statement implied that George took the check from Yahola's home and signed the check himself, contradicting Georges' claim that Lilley took the check and brought it to him and that she helped him sign it. *Id.* Because Lilley's statement was at odds with the statement of George, she did not adopt his statement as true. *Id.*

In the case before us, while being interviewed by Sergeant Kevin Pauley of the Grant County Sheriff's Department, Collins denied having any knowledge of Michelle's death even though Sergeant Pauley informed him that Downs had indicated that Collins shot Michelle. Sergeant Pauley then offered to play Downs's statement for Collins, to which Collins agreed. In that recorded statement Downs said:

"And, and her girlfriend called me and says, she's tryin to talk to me and says, where are you at, where are you at, and I said (inaudible). He pointed the gun at me, he says shut-up motherf* * * *r, give me the phone, so I gave him the f* * * *n phone. And she turned the radio up, and he said f* *k the radio and

he turned it down, and he says you think I'm f* * * *n with you, I'm not f* * * *n with ya, and f* * * *n, like he reached over and f* * * *n put this cannon to her, and he shot her man, he f* * * *n killed her, he shot her f* * * *n there in front of me...." App. at 367–68.[14]

After hearing the statement, Collins immediately changed his story and said that the shooting did not happen as Downs described it. Collins then claimed that the shooting was an accident. He admitted that he was arguing with Michelle about the radio and was holding the gun. He further stated that he cocked the gun, had it pointed at Michelle, and that it went off. He stated repeatedly that he did not mean to shoot her.

The State argues that by changing his story and admitting to shooting Michelle, Collins manifested an adoption of Downs's statement. However, the implication from Downs's statement is that Collins meant to kill Michelle. At the very least, there is no inference to be made from Downs's statement that the shooting was accidental. While Collins adopted the fact that he had shot Michelle, he did not manifest an adoption of the statement to the extent that it would be a confession to an intentional or knowing killing of Michelle.

The critical aspects of the snippet from Downs's statement were the graphic, explicit, and thunderous tone of the statement. We cannot conclude that the State's inclusion of the snippet into Collins's statement was merely to demonstrate that Downs was saying that Collins had the firearm and that it discharged, killing Michelle. The tenor of the Downs statement was to demonstrate the malevo-

---

**14.** This quotation was taken from the transcript of Collins's recorded statement because the videotape was not submitted to this court for the appeal. The parties do not dispute the accuracy of the transcript.

lent, purposeful discharge of the gun into Michelle's head.

To this extent, it is clear that Collins did not adopt (manifestly or otherwise) Downs's characterization of what occurred. At best, Collins agreed that he had the gun, it discharged, and that Michelle was killed. That the occurrence was brutally malicious, as opposed to accidental, was not admitted by Collins. Rather, Collins attempted to refute Downs's statement and, just as in *Lilley*, disagreed with the material element of the statement offered against him. Consequently, the trial court erred in concluding that the statement made by Downs was admissible under Evidence Rule 801(d)(2)(B).

However, in some instances the erroneous admission of evidence is harmless. Errors in the admission of evidence will not result in reversal if the probable impact of the evidence upon the jury is sufficiently minor so as to not affect a party's substantial rights. *King v. State*, 799 N.E.2d 42, 49 (Ind.Ct.App.2003), *trans. denied, cert. denied* —— U.S. ——, 125 S.Ct. 54, 160 L.Ed.2d 24 (2004). Also, an error in the admission of evidence is harmless if the erroneously admitted evidence is cumulative of other evidence appropriately admitted. *Iqbal v. State*, 805 N.E.2d 401, 406 (Ind.Ct.App.2004).

After reviewing the entire transcript, we must conclude that the statement made by Downs is the most condemning evidence of Collins's intent. The State argues that other testimony revealed that the shooting was not accidental and points to the testimony of Kathy Baker, a dispatcher. In her testimony, she quoted Downs as saying, "Man he killed her." Tr. at 435. The State asserts that this reveals that the killing was knowing or intentional. That belies the fact that only a minute later, Baker stated that Downs had told her that they were driving somewhere in Marion when "the gun went off." Tr. at 436. This is more indicative of an accidental shooting than a knowing or intentional shooting which Downs's taped statement implies. Consequently, Baker's testimony does not necessarily lead to the conclusion that Collins had the requisite intent when he shot Michelle.

The State also points to the testimony of Deputy Sheriff Michael Andry. Deputy Andry testified that Downs repeated several times that "Mike shot her. I can't believe he shot her." Tr. at 556–57. The State asserts that the tape recorded statement made by Downs was cumulative of this evidence. We disagree. Once again, the statements attributed to Downs through Deputy Andry's testimony do not necessarily reveal the same level of intent as the recorded statement. Because the erroneously admitted statement was not cumulative of other evidence and the probable impact of the evidence upon the jury was not sufficiently minor, we conclude that the admission of the statement was not harmless. Our holding, in this regard, dictates reversal of the murder conviction.

However, that result does not, upon double jeopardy principles, preclude retrial upon the murder charge if there is sufficient evidence to support a conviction. *Edwards v. State*, 773 N.E.2d 360 (Ind.Ct. App.2002), *trans. denied.* Here, Collins admitted shooting Michelle. Without regard to the statement made by Downs, a reasonable jury might from the evidence of record conclude that the shooting was knowing or intentional and not accidental. Therefore double jeopardy does not bar retrial.

III

*Admission of Photographic Evidence*

Collins also challenges the trial court's decision admitting several photo-

graphs of Michelle's burnt corpse, as well as pictures of the car in which she was burned. He claims that the photographs were unduly prejudicial and cumulative. Furthermore, he argues that he conceded that he had burned the car with Michelle's corpse inside.[15] Because this issue may arise again upon retrial, we will address it.

■■■■ The admission and exclusion of evidence falls within the sound discretion of the trial court. *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind.2002). Thus, we review the admission of photographic evidence solely for an abuse of discretion. *Id.* Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. Ind. Evidence Rule 403. Gory and revolting photos, so long as they are relevant to some material issue or show scenes that a witness could describe orally, may be admissible. *Wilson*, 765 N.E.2d at 1272. This is so when they act as interpretive aids for the jury and have strong probative value. *Id.*

Many cases have addressed the admissibility of photographs of bodies which show severe burning or decay such as is present in the photographs admitted into evidence here. In *Guffey v. State*, 555 N.E.2d 152 (Ind.1990), the appellant challenged the admission of six photographs showing a burned-out car at different angles as being cumulative, irrelevant, gruesome, and calculated to inflame and prejudice the jury. Some of the photographs contained visible portions of the decedent's body, including one photograph showing a leg hanging out of the window. In concluding that the trial court did not err in admitting the photographs, the Supreme Court noted that the body was burned so badly that the leg protruding from the car was barely recognizable as a human leg. *Id.* at 154.

In *Light v. State*, 547 N.E.2d 1073 (Ind. 1989), our Supreme Court noted that the photographs depicting the victim's body were repulsive, as the State readily admitted, showing a nude and charred body, badly decomposed. However, the Court held that they were admissible, stating, "Mindful that revolting crimes generate revolting evidence, we conclude that admission of just three photographs depicting the reality of the offense was not error." *Id.* at 1081.

Here, Collins challenges the admission of several photographs depicting the burned-out car at different angles. Of these pictures, one shows the charred remains of the body on the floorboard. The remaining photographs which he challenges are various pictures of bones found lying loose in the car, as well as several photographs taken during an autopsy. Those photographs are gruesome and repulsive; however, they do depict the injuries which Michelle suffered, including the gunshot wound to the head which was the cause of death. Furthermore, they are highly probative of the evidence needed to prove the crimes with which Collins was charged. While Collins and the State may have stipulated that the car was burned and that Michelle was inside, the charge for Abuse of a Corpse required that the State prove that the corpse was mutilated, a finding which could not be readily made without the jury reviewing the gruesome photographs of the body. *See* I.C. § 35–45–11–2. Additionally, the photographs of the burned-out car cannot be declared to be highly prejudicial. Other than the one photograph depicting the body, they reveal basic photographs of the burnt remains of the car. The trial court did not err in admitting the photographs into evidence.

**15.** The State and Collins stipulated for trial that "the victim found in the charred vehicle was Michelle Jaynes" and that cause of the vehicle fire was arson. Appendix at 217.

The conviction for murder is reversed, and the cause is remanded for further proceedings not inconsistent with this opinion.

MATHIAS, J., concurs.

BAILEY, J., dissents with separate opinion.

BAILEY, Judge, dissenting.

I agree with the majority that Collins did not adopt Downs' statement and its admission was erroneous. However, I dissent from the reversal of Collins' murder conviction, because the evidentiary error is harmless beyond a reasonable doubt. A denial of a defendant's right of confrontation is harmless error where the evidence supporting the conviction is so convincing that a jury could not have found otherwise. *Garner v. State*, 777 N.E.2d 721, 725 (Ind. 2002).

I do not dispute the majority's characterization of Downs' statement as "graphic, explicit and thunderous in tone." At 826 N.E.2d 671, 678. However, there is ample evidence admitted without objection to show that Collins was angry, menacing, and using explicit profanity. Babysitter Rosetta Calhoun, who observed Collins immediately before he took Michelle from her home, described Collins as having "sheer hatred in his eyes." (Tr. 396.) Michelle's daughter K.J., who was awakened during the altercation in which Downs and Collins threatened Michelle and her boyfriend with guns, testified that Collins was using profanity. K.J. reported to Detective Nathan Herring that both men were "yelling and screaming" and forced Michelle into the car by brandishing guns and punching Michelle in the face. (Tr. 968.) Michelle's boyfriend, Kenny Kendall, received a telephone call shortly after Michelle left their residence, in which Michelle told him that she loved him and asked him to take care of her children. His testimony would support the inference that Michelle perceived her life as being threatened at that time.

Moreover, Collins exerted extensive efforts to plan and cover up what he claimed was an accident. Kendall testified that he and Michelle were invited to Downs' home. Once there, Kendall was given marijuana and so much alcohol that he suspected Collins and Downs were deliberately trying to get him intoxicated by "pushing alcohol at him." (Tr. 475.) When the four returned to Michelle's home, Downs suddenly pointed a gun at Kendall and grabbed Michelle, but Kendall was admittedly intoxicated by that time and unable to defend Michelle. After the shooting, Collins set fire to the victim and her vehicle, disposed of Downs' cellular phone by submerging it in water, threw the gun into a wooded area and disposed of the bullets individually. He then fled on a freight train. When apprehended, Collins claimed that his name was Jerry Downs and that he had blood on his clothes because he had been involved in a motorcycle accident. (Tr. 580, 588.) The jury may consider flight and related conduct in determining a defendant's guilt (although an instruction emphasizing flight is improper). *Dill v. State*, 741 N.E.2d 1230, 1232 (Ind. 2001).

A reasonable jury could not have acquitted Collins, but would have found him guilty of murder without Downs' statement. As such, reversal is not required. Therefore, I dissent.