## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Mar 09 2018, 8:42 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Jennifer D. Wilson Reagan
Wilson & Wilson
Greenwood, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

George P. Sherman
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Christopher Michael Potts, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | March 9, 2018 <br><br> Court of Appeals Case No. <br> 41A01-1705-CR-985 <br><br> Appeal from the Johnson Superior Court <br><br> The Honorable Lance D. Hamner, Judge <br><br> Trial Court Cause No. <br> 41D03-1509-F2-6 |

**Baker, Judge.**

[1] Christopher Michael Potts appeals his conviction for Level 2 Felony Battery Resulting in Death to a Person Less Than Fourteen Years of Age.[1] Potts argues that the trial court erred by (1) admitting his videotaped statement to police into evidence; and (2) refusing to give one of his tendered jury instructions. Finding no error, we affirm.

## Facts

[2] Potts and Annabelle Anderson entered into a romantic relationship and she became pregnant with his child. Their daughter, F.A., was born in February 2015.

[3] Annabelle, Potts, and F.A. lived together in a two-bedroom apartment. Annabelle worked at a Waffle House and Potts was unemployed. Therefore, Potts was their daughter's primary caregiver. In August 2015, Annabelle's father, Jack Anderson, who was also unemployed, moved into the apartment.

[4] The morning of September 3, 2015, Annabelle woke up and checked on F.A., who seemed slightly sluggish but fine. Annabelle went back to sleep until later in the morning, when Potts woke her up. Annabelle left the bedroom and heard "a bang" in the bedroom. Tr. Vol. III p. 43. Annabelle asked Potts if he was okay, and he replied that he had "tripped going to the crib." *Id.* Potts went into the bathroom for about ten minutes and then returned to the bedroom.

---

[1] Ind. Code § 35-42-2-1(k).

[5] A few minutes later, Annabelle walked into the bedroom and found Potts holding the infant in his arms. F.A. was not moving or breathing. Potts placed her on the bed and attempted to perform CPR; Annabelle called 911. Jack then entered the bedroom and began performing CPR and continued doing so until paramedics arrived. Paramedics transported F.A. to the hospital, where she was eventually pronounced dead.

[6] A forensic pathologist performed an autopsy on F.A. and determined that she had "a scalp hematoma or collection of blood in the scalp," as well as a large depressed skull fracture in the back of her head. Tr. Vol. II p. 219-21. The pathologist concluded, based on the type of injury, that the cause of F.A.'s death was blunt force trauma. The amount of force needed to cause this type of injury was analogous to being hit by a motor vehicle or having a large piece of furniture fall on top of the child's head.

[7] Franklin Police detectives interviewed Annabelle and Potts separately at the police station on September 4, 2015. While they were interviewing Annabelle, Lieutenant Peter Ketchum was in the room with Potts but no formal interview took place. Potts asked to use the restroom during that time and was allowed to do so.

[8] After completing the interview with Annabelle, Detectives Adam Joseph and Raymond Tice spoke with Potts. They advised him of his *Miranda*[2] rights and

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

informed him that he was not under arrest. Potts acknowledged that he understood and signed a waiver of rights form. The detectives interviewed Potts for approximately ninety minutes. At some point during that time, he asked to use the restroom but was not permitted to do so. At another point, he asked about seeing Annabelle and asked about leaving; one of the detectives understood Potts to be asking "what the next steps were." Tr. Vol. II p. 16, 32.

[9] During the interview, Potts initially stated that he did not know what caused F.A.'s injury. He admitted that he had been under stress because of the couple's financial situation and because he was upset about how many hours Annabelle had been working. The detectives informed Potts that his possible explanations for F.A.'s injury[3] were not consistent with the pathologist's report, and he eventually admitted that he was mad when he went to check on F.A. the morning she died. He said that she had been fussing and that he threw her down. Detective Tice asked Potts how hard he had thrown the baby, and Potts replied, "[t]oo hard," before putting his head down and beginning to cry. Appellee's Ex. 17. At that point, Potts asked to go see Annabelle "to tell her that he was sorry," but the detectives did not allow him to do so. Tr. Vol. III p. 196.

[10] On September 11, 2015, the State charged Potts with Level 2 felony battery resulting in death to a person less than fourteen years of age. Potts moved to

---

[3] At different points in the interview, Potts theorized that F.A.'s injury could have been caused during a play session with Jack a day or two earlier; by hitting her head on a swing in the house; or by CPR.

suppress his statement to the detectives. The trial court held an evidentiary hearing on the motion and denied it on February 21, 2017. The trial court noted for the record that Potts lodged a continuing objection to the admission of the statement into evidence.

[11] Potts's jury trial took place on March 10, 2017. Potts requested the trial court to instruct the jury that it should not consider his statement to police as evidence if the jury found that the police obtained the statement by abuse, threats, duress, violence, or false promises. The trial court declined to give the instruction unless Potts was able to point to evidence suggesting that, in fact, his statement was obtained by abuse, threats, duress, violence, or false promises. He was unable to do so, and the trial court refused to give the instruction.

[12] At the close of the trial, the jury found him guilty as charged. On April 7, 2017, the trial court sentenced Potts to thirty years imprisonment, with five years suspended to probation. Potts now appeals.

# Discussion and Decision

## I. Admission of Statement

[13] Potts first argues that the trial court erroneously admitted his statement to the detectives into evidence. The admissibility of a statement "is controlled by determining from the totality of the circumstances whether it was made voluntarily and not induced by violence, threats, or other improper influences that overcame the defendant's free will." *Treadway v. State*, 924 N.E.2d 621, 635 (Ind. 2010). The State has the burden to prove beyond a reasonable doubt

that the defendant voluntarily and intelligently waived his rights and that the statement was voluntarily given. *Id.* On appeal, we will not reweigh the evidence and will affirm if the trial court's ruling is supported by substantial evidence. *Wilkes v. State*, 917 N.E.2d 675, 680 (Ind. 2009).

[14] In this case, it is undisputed that the detectives properly advised Potts of his *Miranda* rights. It is also undisputed that he waived those rights, both verbally and in writing. Potts argues that his waiver was not intelligent and that his subsequent statement was not voluntary.

[15] With respect to the waiver, Potts points out that he was twenty-one years old, did not finish high school, and had been in special education classes while in school. Notwithstanding those facts, there is no indication that Potts had any difficulty understanding and communicating with the detectives during the interview. Detective Joseph testified that he had no concerns about Potts's intellect: "During the course of the interview, he was interactive. He was able to speak with me, he answered questions. He described things, such as the CPR. He was able to describe things. He was very willing to ask questions . . . ." Tr. Vol. IV p. 6. In other words, nothing in the record remotely indicates that Potts's mental state or intellectual abilities impacted his ability to intelligently waive his rights. *See Jackson v. State*, 735 N.E.2d 1146, 1154 (Ind. 2000) (holding that a defendant's limited education, standing alone, does not render a confession involuntary). We find no error on this basis.

[16] With respect to whether Potts's statement was voluntary, he emphasizes that on multiple occasions during his interview with the detectives, he asked to use the restroom, leave, and/or see Annabelle; each time, they denied permission for him to do so. A review of the interview, however, shows that at no point did Potts invoke his rights to remain silent or speak with counsel, nor did he ask to end the interview.

[17] We find *Hodges v. State*, 524 N.E.2d 774 (Ind. 1988), instructive. In *Hodges*, the defendant argued that his statement to police was involuntary because he claimed he "was illegally held until he took [a] polygraph test" and "reasonably believed he was not free to leave." *Id.* at 782. He also claimed that "police failed to stop questioning him when he said he did not want to be questioned." *Id.* Our Supreme Court, however, noted that the defendant had been advised of his rights and "voluntarily continued to talk with the officers and answer their questions." *Id.* at 782-83. Consequently, the trial court did not err by finding that the defendant's statement was voluntary. *Id.*

[18] Here, likewise, the detectives advised Potts of his rights. He waived those rights. And although his requests to leave for various reasons were denied, he continued to talk with the detectives and answer their questions. There is no evidence whatsoever remotely tending to suggest that he experienced any physical abuse, psychological intimidation, deceptive interrogation tactics, or threats at the hands of police. *Cf. Light v. State*, 547 N.E.2d 1073, 1079 (Ind. 1989) (defendant's statement was voluntary despite evidence of a four-hour interrogation punctuated by police conduct involving cursing, lying, and

smacking the defendant on the arm); *Malloch v. State*, 980 N.E.2d 887, 902-03 (Ind. Ct. App. 2012) (defendant's statement was voluntary despite a "confrontational and intense" interrogation in which the detective challenged the defendant's manhood, berated the defendants, and repeatedly made false assertions regarding evidence). The interview of Potts lasted less than two hours and the detectives behaved in a professional manner throughout. We find that the trial court did not err by finding that Potts's statement was voluntary or by admitting the statement into evidence.

## II.  Jury Instruction

Next, Potts argues that the trial court erred by refusing to give one of his tendered jury instructions. When evaluating jury instructions on appeal, we look to whether the tendered instruction correctly stated the law, whether there is evidence in the record to support giving the instruction, and whether the substance of the proffered instruction is covered by other instructions. *Treadway*, 924 N.E.2d at 636. We will reverse only if the instructional error prejudiced the defendant's substantial rights. *Id.*

Potts's tendered jury instruction stated as follows:

> Evidence has been introduced that the Defendant made a statement concerning the crime charged. It is for you to determine, in light of all the circumstances under which the statement was made, if it was properly obtained by the police. The law does not allow the police to obtain a statement by abuse, threats, duress, violence, or false promises. If you find that police obtained the statement by such means, you should not consider the statement as evidence against the Defendant. If you find

from a consideration of all the evidence that the statement was properly obtained by police, then it is for you to determine what value should be given to the statement.

Appellant's App. Vol. II p. 54.

[21] Initially, we note that it is well established that it "is the role of the trial court—not the jury—to determine whether a statement made by a defendant is voluntary and therefore admissible." *Crain v. State*, 736 N.E.2d 1223, 1239 (Ind. 2000). As a result, to the extent that the above instruction—which, admittedly, is based on an Indiana Pattern Criminal Jury Instruction—would have permitted the jury to infringe on matters reserved for the trial court, it was improper. *See id.* (noting that the trial court was not obligated to present a jury instruction regarding the voluntariness of defendant's statements).

[22] Furthermore, the instruction was not supported by the evidence. As noted above, there was no evidence in the record that the police had obtained Potts's statement by abuse, threats, duress, violence, or false promises. Therefore, the trial court was not obligated to present the jury instruction. We find no error in the trial court's decision to decline to give this instruction to the jury.

[23] The judgment of the trial court is affirmed.

Vaidik, C.J., and Altice, J., concur.