## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 15 2015, 8:33 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Marielena Duerring
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Jodi Kathryn Stein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Terry W. Waugh, Jr.,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

May 15, 2015

Court of Appeals Case No. 71A03-1408-CR-312

Appeal from the St. Joseph Superior Court

Honorable Jerome Frese, Judge

Cause No. 71D03-0507-FA-43

**Friedlander, Judge.**

Terry W. Waugh, Jr., appeals his conviction for three counts of Child Molesting, one as a class A felony and two as class C felonies.[1] He presents the following restated issues for review:

1. Did the trial court abuse its discretion by admitting certain evidence over Waugh's objection based on Indiana Evidence Rule 403?

2. Was DNA evidence admitted without the State establishing a proper chain of custody?

3. Is Waugh's sixty-six-year sentence inappropriate in light of his character and the nature of his offenses?

We affirm.

In 1997, Scott Waugh (Scott) began dating B.D.'s mother (Mother) and shortly thereafter moved into their residence in South Bend. B.D. was about four years old at the time. Scott's younger brother, Waugh, is about ten years older than B.D., and he began essentially living with them[2] after a couple years. Waugh and B.D. had a good, sibling-type relationship for a number of years.

Waugh began visiting B.D. in her bedroom in 2003 when B.D. was in fifth grade. He expressed jealousy over B.D.'s fifth-grade boyfriend, and he stayed up late talking with her. After several nights of conversation, Waugh became

---

[1] The version of the statute in effect at the time the offenses were committed classified the charged offenses as class A and C felonies. Ind. Code Ann. § 35-42-4-3 (West, Westlaw 2013). This statute has been revised and in its current form reclassifies the offenses as Level 1 and 4 felonies. *See* I.C. § 35-42-4-3 (West, Westlaw current with P.L.1-2015 to P.L. 60-2015 of the 2015 First Regular Session of the 119th General Assembly with effective dates through April 23, 2015).

[2] Waugh slept on the couch, as he did not have his own bedroom. Scott and Mother shared an upstairs bedroom, and B.D. had her own upstairs bedroom.

physical with B.D. He would fondle her breasts and her vagina, perform oral sex on her, masturbate himself, and occasionally ejaculate on her. These actions occurred on a nearly nightly basis through the end of B.D.'s sixth-grade year. During this period, Waugh "would say things about how he loved [B.D.] and how the first time [she] had sex would be with him". *Transcript* at 91. There were times that Waugh would "get really down" and indicate to ten- or eleven-year-old B.D. that he was going to kill himself. *Id*. at 92.

[5] On or about May 8, 2005, Waugh last performed oral sex on B.D., and he ejaculated onto her clothing. Waugh was twenty-one years old at this time, and B.D. was eleven years old. The next night when Waugh came to her bedroom, B.D. informed him that she had a rash on her vaginal area. Waugh had a cold sore on his mouth at the time and asked to see the rash. After looking at it, Waugh told B.D. it was fine.

[6] On May 10, 2005, B.D. went to the school nurse regarding her itchy and burning rash. Based on her symptoms, the nurse indicated that it might be a yeast infection. B.D. went home and told Mother, who then looked at the area and observed "bumpy blisters". *Id*. at 32. Over-the-counter medicine did not relieve the pain, so Mother made an appointment for B.D. at MedPoint.

[7] The next day, May 11, B.D.'s grandmother took the child to the appointment. Dr. Gary Sunada diagnosed B.D. with herpes simplex type one (HSV-1). Because B.D. had intact blisters and lesions on her labia, Dr. Sunada believed this suggested early onset HSV-1. He testified that HSV-1 is very

communicable and is typically transmitted by direct contact with an open cold sore.[3] Specifically, Dr. Sunada testified that HSV-1 can be transmitted from the lip area to the genital area through direct contact.

[8] After being informed that she had genital herpes and the doctor explaining how it was transmitted, B.D. "almost passed out" during the appointment. *Id.* at 84. Immediately thereafter, B.D. asked her grandmother to go into the restroom with her. Once inside the restroom, B.D. began crying and informed her grandmother of Waugh's abuse. B.D.'s grandmother called Mother from the car, who in turn called the police.

[9] During the investigation, police recovered pajama pants and a shirt matching the description of the clothing B.D. wore during her last sexual encounter with Waugh. DNA testing of the "non-sperm and sperm fractions of the cuttings from the pants" matched Waugh's DNA profile. *Id.* at 254. The investigation also revealed that Waugh had admitted to Scott that while there was no intercourse, "there was some inappropriate touching and kissing between him and [B.D.] and that involved private parts." *Id.* at 273.

[10] On July 14, 2005, the State charged Waugh with four counts of child molesting: Count I and II as class C felonies, Count III as a class A felony, and Count IV as a class B felony. After a number of continuances, Waugh's jury trial was

---

[3] Dr. Sunada explained the difference between HSV-1 and HSV-2. According to the doctor, while it can be transmitted to other areas of the body, HSV-1 is usually present on the lips and it is the most common cause of cold sores. Further, he testified that HSV-2 is "the usual cause of genital herpes." *Id.* at 334.

scheduled for January 16, 2007. Waugh appeared for a pretrial hearing in December 2006 but failed to appear for a scheduled hearing on January 5, 2007. The trial court issued a bench warrant and vacated the trial date. Waugh remained at large for nearly seven years, finally being captured by federal marshals at a motel in Angola, Indiana, on November 16, 2013.

[11] Waugh's jury trial commenced in July 2014, nine years after he was charged. B.D., who was twenty-one years old by that time and a senior in college, testified against Waugh. The jury found Waugh guilty of Counts I-III and not guilty of Count IV. The trial court sentenced Waugh to consecutive eight-year sentences for the two class C felonies and a consecutive fifty-year sentence for the class A felony. This resulted in an aggregate term of sixty-six years in prison, the maximum sentence he could receive. Waugh now appeals. Additional facts will be presented below as needed.

1.

[12] Waugh contends that the trial court abused its discretion when it allowed Dr. Sunada to testify regarding B.D.'s herpes diagnosis. He claims that admission of this evidence violated Indiana Evidence Rule 403 because any probative value was outweighed by the prejudicial impact.

[13] A trial court's ruling on the admissibility of evidence is reviewed for an abuse of discretion. *Blount v. State*, 22 N.E.3d 559 (Ind. 2014). Accordingly, we will reverse only where the decision is clearly against the logic and effect of the facts and circumstances before the court or the trial court misinterpreted the law. *Id.*

Further, "[e]rrors in the admission of evidence are to be disregarded as harmless unless they affect the substantial rights of the defendant." *Goudy v. State,* 689 N.E.2d 686, 694 (Ind. 1997). "[A]n error in the admission of evidence is harmless if the erroneously admitted evidence is cumulative of other evidence appropriately admitted." *Collins v. State,* 826 N.E.2d 671, 679 (Ind. Ct. App 2005), *trans. denied.*

[14] Evid. R. 403 provides that relevant evidence may be excluded if its probative value is substantially outweighed by, among other things, a danger of unfair prejudice. "Evaluation of whether the probative value of an evidentiary matter is substantially outweighed by the danger of unfair prejudice is a discretionary task best performed by the trial court." *Bryant v. State*, 984 N.E.2d 240, 249 (Ind. Ct. App. 2013), *trans. denied.*

[15] Waugh claims that the probative value of the evidence was low because the State failed to establish that he was a carrier of the HSV-1 virus. Further, he asserts that this virus is "extremely common and can be found in children without there ever being any form of sexual contact." *Appellant's Brief* at 9.

[16] B.D. testified that she knew what a cold sore was and that it "developed on the mouth" but that she did not know, prior to her diagnosis, that a cold sore was related to herpes. *Transcript* at 120. D.B. further testified that, *while she had observed cold sores on Waugh before her diagnosis*, she had never had any cold sores on her mouth prior to that time. In fact, when Waugh learned of the rash, D.B.

testified that he looked at it "to make sure that it didn't look like the cold sore that he had." *Id*. at 83.

[17] Contrary to Waugh's assertions, the State presented evidence that Waugh had cold sores at the time that he was alleged to have performed oral sex on the child. Accordingly, there was a substantial likelihood that he carried the HSV-1 virus. While HSV-1 is highly transmittable even without sexual contact, in this case, the child's HSV-1 was located on her vaginal area rather than her mouth. Dr. Sunada explained that such transmission would typically occur via direct contact from the lip area of the infected person to the genital area.

[18] In light of evidence linking Waugh to HSV-1, the trial court did not abuse its discretion by allowing Dr. Sunada to testify regarding B.D.'s HSV-1 diagnosis. Moreover, any error in the evidence's admission would have been harmless because it was cumulative of B.D.'s testimony. Prior to the doctor's testimony, B.D. testified regarding her appointment and diagnosis. She testified, without objection from Waugh, that the doctor told her she had genital herpes, which he explained was "transmitted through oral sex or vaginal sex." *Id.* at 84. She later indicated, "the doctor explained to me that it was a sexually transmitted disease." *Id*. at 120.

## 2.

[19] Waugh also challenges the admission of the DNA results indicating that his DNA was found on B.D.'s pajama pants. He claims the State failed to establish an adequate chain of custody.

It is well established in Indiana that an exhibit is admissible if the evidence regarding its chain of custody strongly suggests the exact whereabouts of the evidence at all times. That is, in substantiating a chain of custody, the State must give reasonable assurances that the property passed through various hands in an undisturbed condition. We have also held that the State need not establish a perfect chain of custody whereby any gaps go to the weight of the evidence and not to admissibility.

*Culver v. State*, 727 N.E.2d 1062, 1067 (Ind. 2000) (citations omitted). Further, "[t]o mount a successful challenge to the chain of custody, one must present evidence that does more than raise a mere possibility that the evidence may have been tampered with." *Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002).

The record establishes that on May 11, 2005, South Bend Police Officer Anne Hayes collected from B.D.'s bedroom, among other things, the T-shirt and pajama pants that B.D. reportedly had worn during the last molestation. Officer Hayes testified that she placed these items of clothing in an evidence bag, which she then sealed, tagged, and placed in a locked evidence room pursuant to standard procedure. Thereafter, on June 23, Detective Ken Kahlenbeck met Waugh for a blood draw, the results of which were properly sealed in an Indiana State Police (ISP) collection kit and then stored in a secure location in the South Bend Police Department until taken to the ISP Laboratory for analysis.

The parties entered into the following stipulation at trial regarding this evidence:

> On July 13, 2005, Officer Betsey Culp of the South Bend Police Department delivered the sealed [ISP] collection kit containing the

blood drawn from Terry Waugh, Jr., at the South Bend Medical Foundation on June 23, 2005, and the sealed evidence bag containing pajama pants and a white shirt collected on May 11, 2005, by [Officer Hayes] from [B.D.'s bedroom] from their secure storage locations at the South Bend Police Department to the [ISP] Laboratory in Indianapolis for analysis.

*Transcript* at 191-92.

[23] Julie Mauer, a forensic biologist at the ISP Laboratory testified the lab received Item 01 (the sealed collection kit taken from Waugh) and Item 02 (the sealed evidence bag containing pajama pants and a shirt from B.D.) and assigned the ISP case number 05L1295. Maurer testified that Item 01 was "seal marked KK" and Item 02 was "[s]eal marked AH459."[4] *Id.* at 206. Mauer completed a serology examination of the items on September 8, 2005.

[24] With respect to Item 01, Mauer noted that the collection kit was "signature sealed with red evidence tape" and marked "Terry Wayne Waugh, Jr. The date/time collected was 06-23-05 at 1619". *Id.* at 208. Mauer then made a stain card with the blood sample and labeled it with the item number 1A1, along with her initials and the ISP case number. After it was dry, Mauer placed the stain card into an envelope and then another envelope with a unique ISP bar code. Both envelopes were marked with the case number, item number, and her initials.

---

[4] We observe that the initials of the officers who collected Item 01 and Item 02 were K.K. and A.H., respectively.

[25]  Regarding Item 02, Mauer testified that it was a brown paper bag signature sealed with clear packing tape. The outer markings on the bag indicated "purple pajama pants with Cinderella and white shirt with red, white, and blue Raggedy Ann." *Id.* at 210. Mauer indicated that two items were found inside the bag, purple pants that Mauer labeled 2A and a T-shirt that she labeled 2B. Mauer examined each item for stains and took cuttings. The cuttings from the pants were placed in an envelope labeled 2A1, and the cuttings from the shirt were placed in an envelope labeled 2B1. Mauer testified that she then placed envelopes 2A1, 2B1 and 1A1 all together in a larger envelope (with the unique ISP bar code, Mauer's initials, and the ISP case number) and returned them to the ISP evidence clerk.

[26]  In December 2005, the large envelope containing 2A1, 2B1 and 1A1 was sent to Orchid Cellmark, a private DNA laboratory in Nashville, Tennessee. Sarah Walker, a DNA analyst for Orchid Cellmark, testified that evidence is generally received by an overnight courier such as FedEx and is placed in a secure evidence locker by the forensic supervisor. Walker testified that she examined the evidence related to Waugh's case in June 2006 and that upon her receipt of the evidence envelope, she noted it was sealed with no signs of damage or tampering. Referring to her case file, Walker specifically testified that the envelope contained ISP item 1A1 (a stain card made Terry Waugh's blood standard), item 2A1 (cuttings from B.D.'s pants), and item 2B1 (cuttings from B.D.'s T-shirt).

[27] When Walker was asked about the results of her analysis, Waugh objected based on chain of custody. He claimed there was a lack of evidence establishing how the evidence was transported from the ISP Laboratory to Orchid Cellmark. Further, Waugh indicated that the physical evidence had not been admitted and, thus, Walker and Mauer could not specifically identify it by signature, case number, or laboratory number.

[28] Following Waugh's objection, the State asked Walker: "when you received the batch of evidence and it was assigned to you, was there an Indiana State Police Lab number on that batch of evidence?" *Id.* at 245. Walker responded affirmatively and then stated, "ISP Laboratory case number, 05L1295." *Id.* at 247. Walker further indicated that the paperwork sent from ISP included an itemized receipt specifically documenting the contents of the envelope and referencing Waugh and B.D.

[29] Upon this additional testimony, the trial court overruled Waugh's objection. Walker then proceeded to testify that the "DNA results obtained from the non-sperm and sperm fractions of the cutting taken from the pants of [B.D.] are consistent with the DNA profile obtained from the stain card made from the purple top blood standard of Terry Wayne Waugh, Jr., item 1A1."[5] *Id* at 254.

[30] We conclude that the State presented sufficient chain-of-custody evidence with respect to the pajama pants, Waugh's blood sample, and items 1A1 and 2A1.

---

[5] Walker did not test the cutting from B.D.'s shirt, item 2B1.

Though there are small gaps, the evidence strongly suggests the whereabouts of this evidence at all times and that the evidence passed through various hands in a sealed and undisturbed condition. In particular, Mauer and Walker testified that the evidence came into their possession in a sealed condition, and they both referenced the ISP case number 05L1295, the related item numbers, and the description of the evidence being tested. Further, during her testimony, Walker referenced the paperwork sent from ISP that included an itemized receipt documenting the specific contents of the envelope and directly referencing Waugh and B.D. *See Filice v. State*, 886 N.E.2d 24, 35 (Ind. Ct. App. 2008) ("[w]hile there is no evidence in the record regarding specific details of the sample's custody at Mid-America, Dr. Evans testified that AIT received the sealed sample with a 'Bill of Lading that identifies each specimen'"), *trans. denied*.

[31] The State adequately established that the DNA evidence analyzed by Walker came from B.D.'s pajama pants and Waugh's blood sample. The trial court, therefore, did not abuse its discretion by allowing Walker to testify regarding the DNA results.

3.

[32] Finally, Waugh argues his sentence is inappropriate. Indiana Appellate Rule 7(B) gives appellate courts the authority to revise a defendant's sentence if, "after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character

of the offender." Because sentencing is principally a discretionary function, we give the trial court's judgment considerable deference. *Cardwell v. State*, 895 N.E.2d 1219 (Ind. 2008). Our inquiry focuses on the aggregate sentence, rather than the number of counts, length of the sentence on any individual count, or whether sentences are concurrent or consecutive. *See Brown v. State,* 10 N.E.3d 1 (Ind. 2014). It is the defendant's burden to persuade us that the sentence is inappropriate. *Childress v. State,* 848 N.E.2d 1073 (Ind. 2006).

[33] In this case, the trial court imposed the maximum sentence on each of the three counts and ordered them to be served consecutively.[6] This resulted in an aggregate sentence of sixty-six years in prison. Maximum sentences are generally appropriate for the worst offenders. *Harris v. State*, 897 N.E.2d 927 (Ind. 2008). "This is not, however, a guideline to determine whether a worse offender could be imagined. Despite the nature of any particular offense and offender, it will always be possible to identify or hypothesize a significantly more despicable scenario." *Id*. at 929-30 (quoting *Buchanan v. State,* 767 N.E.2d 967, 973 (Ind. 2002)).

[34] We turn first to the nature of Waugh's offenses. The evidence establishes that after a period of grooming, Waugh systematically abused B.D. on a nearly

---

[6] The sentencing range for a class A felony is twenty to fifty years. Ind. Code Ann. § 35-50-2-4(a) ((West, Westlaw current with P.L.1-2015 to P.L. 60-2015 of the 2015 First Regular Session of the 119th General Assembly with effective dates through April 23, 2015). The sentencing range for a class C felony is two to eight years. I.C. § 35-50-2-6(a) (West, Westlaw current with P.L.1-2015 to P.L. 60-2015 of the 2015 First Regular Session of the 119th General Assembly with effective dates through April 23, 2015).

nightly basis for approximately two years, while she was ten and eleven years old.[7] In addition to repeatedly fondling and performing oral sex on the girl who was like a sister to him, Waugh often ejaculated on her, including at least once on her face. Waugh informed the child that the first time she had sexual intercourse would be with him, and he expressed jealousy over a fifth-grade boy she liked. Waugh also threatened D.B. on a number of occasions that he would kill himself, which frightened the child into keeping quiet. D.B. finally reported the abuse after being diagnosed with HSV-1, an incurable herpes virus that Waugh transmitted to her vaginal area while performing oral sex on her.[8] The child's nightmare, however, did not cease once criminal charges were filed because just before his 2007 trial, Waugh fled and remained a fugitive for nearly seven years. Waugh carried on with his life – having two children with his girlfriend – while D.B. continued to live in fear.[9]

[35] With respect to Waugh's character, the record is not particularly favorable. Waugh was thirty-years old and had two children at the time of sentencing, yet

---

[7] Waugh's claim that the period of abuse was much shorter in duration is without merit.

[8] Waugh claims on appeal that the record does not establish he was the source of the virus. In addition to D.B.'s testimony regarding cold sores she saw on Waugh, we observe that the PSI indicates "defendant reported he has been tested for STD's in 2005 and tested positive for HSV-1 (Herpes-Cold Sore)." *Appellant's Confidential Appendix* at 33.

[9] D.B., then twenty-one years old, explained at sentencing:

> For more than half my life Terry Waugh has been my nightmare. Even after my disclosure when the abuse ceased, I was still afraid of him. When he was not incarcerated for all of those years, I double-checked my locks and peeked over my shoulder for his face. I have felt unsafe for too long and nearly every day still I am reminded of the things he did to me….

*Transcript* at 444.

he had never held full-time job and he admitted daily use of marijuana since age fifteen. Despite an average childhood, Waugh dropped out of high school and left his parents' home at age sixteen. This resulted in periods of homelessness and him sleeping on the victim's family's couch for several years. Finally, while we acknowledge that Waugh had no significant prior criminal history, his decision to flee and remain a fugitive for nearly seven years speaks volumes as to his character.

[36] In this case, we find that sentence revision is not supported by the nature of the offenses, nor by positive character traits of the offender. The evidence does not present a sufficiently compelling basis to override the decision of the trial court.

[37] Judgment affirmed.

Baker, J., and Najam, J., concur.