**Roy Lee WARD, Appellant
(Defendant below),**

v.

**STATE of Indiana, Appellee
(Plaintiff below).**

No. 74S00–0108–DP–361.

Supreme Court of Indiana.

June 30, 2004.

relief is not warranted. *Baum v. State,* 533 N.E.2d 1200 (Ind.1989).

---

Steven E. Ripstra, Ripstra Law Office, Jasper, IN, Lorinda Meier Youngcourt, Huron, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, James B. Martin, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

RUCKER, Justice.

## Case Summary

As the result of a brutal slaying Roy Lee Ward was convicted of murder and sentenced to death. He was also convicted and sentenced to a term of years for rape and criminal deviate conduct. In this direct appeal Ward raises several issues for our review, one of which is that this case should not have been tried in the county where the crimes were committed because of community bias and pervasive pretrial publicity. The record supports this contention. We are therefore constrained to reverse and remand this cause for a new trial.

## Facts and Procedural History

On the morning of July 11, 2001, fifteen-year-old Stacy Payne was present in her Dale, Indiana home. Also present was her younger sister Melissa who was asleep in her bedroom. Stacy was waiting to leave for work. Other members of the family had already left for their jobs. Pretending that he was searching for a lost dog, Ward approached the Payne residence and convinced Stacy to allow him to enter the house. Thereafter Melissa awoke to the sound of Stacy screaming. Going to the top of the stairs Melissa saw a man lying on top of Stacy holding her down. Melissa then ran to her parents' room and dialed 911. As she was talking on the telephone Melissa could hear her sister saying "please stop."

Shortly thereafter the Dale Town Marshall arrived and saw Ward standing in the doorway, covered with perspiration, and holding a knife. Drawing his service revolver, the Marshall ordered Ward to the ground. Ward complied saying, "I didn't do anything." The Marshall then went to the kitchen and found Stacy lying on the floor, nude from the waist down, covered with blood, and her intestines exposed. Although conscious, Stacy could not speak. She was taken immediately to the emergency room of the Deaconess–St. Joseph Hospital where doctors noted a laceration to Stacy's abdomen, a laceration to her back that severed her spine, and a laceration across Stacy's neck cutting her trachea. Efforts to save Stacy's life were unsuccessful. A subsequent forensic examination revealed that Stacy suffered eighteen blunt force injuries, including injuries found within the vaginal vault.

On July 16, 2001, the State charged Ward with murder, and subsequently filed a notice of intent to seek the death penalty. Thereafter, the State filed an amended information to include one count of rape

as a Class A felony and one count of criminal deviate conduct as a Class A felony.

The Town of Dale, located in southwestern Spencer County, is a small close-knit community. As of the 2000 census, Spencer County had a total population of 20,400. As one local newspaper recounted, "The brutal stabbing of a 15-year-old girl last week in her own home has left this community, as well as surrounding communities, in shock and law enforcement officials in search of answers." Appellant's App. at 6281. Another newspaper reported, "Community reaction is one of stunned disbelief after the news of 15-year-old Stacy Payne's murder Wednesday afternoon in her own home outside of Dale. 'Things like this just don't happen in small towns like Dale, Indiana' is a common reaction to the news that has parents hugging their children, locking their doors and grieving with the Payne family." Id. at 6295.

On February 8, 2002, Ward filed a motion for change of venue from the county, or in the alternative a motion to draw the jury from another county pursuant to section 35–36–6–11 of the Indiana Code.[1] Although Ward later withdrew the motion when the trial court denied his request for a continuance for the purpose of having a survey conducted, Ward refiled the motion on April 11, 2002. As grounds for the motion Ward alleged public outrage, hostility, and prejudicial pretrial publicity. A hearing on the motion was conducted May 20, 2002. The parties stipulated into evidence several exhibits, including twenty-five articles from four local and regional newspapers, and either the videotape or transcript from three local and regional television stations representing fifteen news stories. Although the news accounts were graphic and detailed, they were generally accurate. Many of the accounts however also included details of Ward's past criminal history that would not have been admissible at trial.[2] The evidence at

1. The statute provides,

    (a) In any criminal proceeding wherein the defendant is charged with murder or a Class A felony to be tried before a jury in which a motion for a change of venue from the county is filed, the court may recognize but decline to grant the motion, and order that the jury be drawn from the residents of a county other than the county in which the court is located.

    (b) Pursuant to an order under this section, the court may convene in any county in the state for purposes of jury selection. The venire may be drawn by the jury commissioners of a court in the jurors' home county, or may be drawn by the court itself by random selection.

    (c) After a jury is selected, the trial shall be held in the county of the court's location. The verdict of the jury and the judgment based upon it have the same validity and effect as if the jury had been drawn from the county of the court's location.

2. See David Kunz, "Motive missing in teen slaying," The Herald, July 13, 2001; Appellant's App. at 6269 ("Ward had recently been

sentenced to jail in Harrison County Superior Court after pleading guilty to harassment and public indecency, both misdemeanors."); David Kunz, "Death penalty being sought for Ward," The Herald, Aug. 3, 2001; Appellant's App. at 6272 ("Ward was on probation until April 2004 in connection with a burglary conviction from Cooper County, Mo., records said."); W. Curt Vincent, "Teen stabbed to death," The Spencer County Journal–Democrat, July 19, 2001; Appellant's App. at 6282 (noting Ward's "long criminal record" which included at least eight prior convictions extending back to 1993); Bryan Walters, "Death penalty sought," The Journal–Democrat, Aug. 9, 2001; Appellant's App. at 6284 ("Ward was already on probation in Perry County for another crime."); Cheryl Hurst, "Investigation into murder of Dale girl continues," The Spencer County Leader, July 19, 2001; Appellant's App. at 6297 (noting Ward's convictions for burglary, harassment, public indecency, forgery, and theft); Bonnie Hackman, "Death penalty sought for murder of Stacy Payne," The Leader, Aug. 9, 2001; Appellant's App. at 6299 (noting the outstanding warrant for Ward for check deception and his status on probation for indecent expo-

the hearing, including testimony of witnesses, also revealed that a vigil was held for Stacy at which nearly twelve hundred people attended. Over five hundred mourners attended her funeral. At the close of the hearing, the trial court took Ward's motion for change of venue under advisement. About a month before trial, at a hearing in which Ward appeared, an angry audience yelled at Ward as he was being escorted through the courthouse rotunda; the trial court admonished the crowd for its behavior.

On October 7, 2002, the jury selection process began. The trial court had summoned one hundred twenty-eight prospective jurors. Outside of their presence Ward renewed a number of previous motions and also requested the court to "grant our Motion for Change of Venue. . . ." Tr. at 4. The trial court responded, "All motions denied." *Id.* In groups of approximately thirty to forty, the prospective jurors were then brought into the courtroom where the trial court gave them a few brief instructions. The trial court also gave the prospective jurors a lengthy twenty-eight-page questionnaire that had been previously tendered by the defense and agreed to by the State. The prospective jurors were directed to complete the

questionnaire, give it to the bailiff, and return to court the following day.

The parties began a two-day voir dire on October 8, 2002. The responses given on the questionnaires revealed the pervasive nature of the pretrial publicity, the extent of the community's knowledge about this case, and its understandable outrage. Of the one hundred twenty-eight prospective jurors summoned, one hundred twenty-two actually completed the questionnaire. Over eighty percent—101—reported that he or she had knowledge about the case. For example, one prospective juror wrote, "unless you live under a rock you have heard a lot" about this case. Appellant's App. at 3673. In response to the question, "what did you discuss and with whom?" another prospective juror said, " 'with whom?' [E]veryone was talking about it— you couldn't go anywhere!" *Id.* at 5192.

In response to the question: "Based on what you have read, seen, or heard about this case, have you formed any beliefs as to the guilt or innocence of Roy Ward?" over sixty-five percent—84 prospective jurors—checked "yes." When asked to "please describe your beliefs" the responses of the 84 prospective jurors ranged from "I think that he probably did it," *id.* at 2891, to "hang him instantly, and he should have been shot on the spot at the scene of the crime." *Id.* at 4456.[3]

sure); Cheryl Hurst, "Trial date set for murder of Dale teen," *The Leader*, Nov. 15, 2001; Appellant's App. at 6301 ("Ward, a repeat offender, had been released from the judicial system time and again for charges relating to burglary, check deception, harassment, public indecency, forgery, theft and stalking."); Cheryl Hurst, "Investigation into murder of Dale girl continues," *Ferdinand News*, July 18, 2001; Appellant's App. at 6308 (noting Ward's convictions for burglary, harassment, public indecency, forgery, and theft); Bonnie Hackmann, "Death penalty sought for murder of Stacy Payne," *Ferdinand News*, Aug. 8, 2001; Appellant's App. at 6310 (noting the outstanding warrant for Ward for check deception and his status on probation for indecent exposure).

3. Other representative responses included, "Tie him up with rawhide in the desert and let him die slow and painful." Appellant's App. at 5169; "[T]hey should hang him up and start pulling off body parts." *Id.* at 3213; "[T]hey need to cut off his * * * * and stick it up his * * * and gut him like he did her." *Id.* at 4709; "[T]he cop should have shot the S.O.B." *Id.* at 3005; "[S]hould be stoned to death. [J]ail would be to [sic] easy for him." *Id.* at 3904; "Death penalty for sure." *Id.* at 3006; "He is guilty. . . . He should not even deserve a trial." *Id.* at 3490; "[H]e should be given the same punishment that he gave to the victim." *Id.* at 3513; "[S]hould do to him what he done to her." *Id.* at 3535; "[Y]ou would have to prove to me Ward did not do the murder." *Id.* at 3863; "[S]hould be made

During the course of voir dire a total of forty-eight prospective jurors were removed for cause either on challenge by the defense, the State, or *sua sponte* by the trial court. The State used sixteen peremptory challenges and Ward exhausted all of his.[4] Ultimately twelve jurors and two alternate jurors were selected and sworn. On the morning of the first day of trial, Ward renewed his motion for change of venue, which the trial court denied.

The record shows that of the jurors selected, all but one had heard, seen, or read about this case. And six of the seated jurors were among the over sixty-five percent who checked "yes" to the question of whether they had formed a belief concerning Ward's guilt or innocence. Juror # 14 explained on his questionnaire "He was arrested at the home just a few minutes after the 911 call." *Id.* at 2914. Juror # 84 wrote, "since he was at the scene he might be the person who done [sic] it." *Id.* at 3611. When asked to describe her beliefs, Juror # 121 replied, "It would be very difficult to form an unbiased opinion. He was caught at the site with a knief [sic] and the sister saw him. If it were my own daughters I would have probably come after him myself." *Id.* at 4019. When asked later in her questionnaire whether there was *anything* that might get in the way of her being an impartial juror, she checked "Yes" and wrote, "[H]e was caught at the site—I feel he's guilty." *Id.* at 4024.

Explaining the reasons for her beliefs, Juror # 122 responded, "If everything that I have heard is true, it will be hard but not impossible to believe that he did not do it." *Id.* at 4042. The daughter of juror # 122

attended the same school as the victim. *Id.* at 4025. She also commented on her questionnaire about the "devastation of [the] family" and the "horror of it all" and how the crime was "such a tragedy." *Id.* at 4042.

When asked on the questionnaire whether she had formed any beliefs about Ward's guilt or innocence, Juror # 148 checked "Yes" and wrote, "This man was inside their house. Her sister saw him and called 911. I would listen with an opened [sic] mind, but I feel the evidence will be there and he will be convicted." *Id.* at 4433. She mentioned twice in her questionnaire the "pools of blood" that had surrounded the victim. *Id.* at 4432, 4433. When asked to describe what she had read, seen, or heard about this incident this juror responded, "He had entered the house, stabbed and raped her while her sister was upstairs making the 911 call. That he had been stalking her. The child was taken to Huntingburg Hospital and the Dr.'s faces were so grim and the workers had to keep wiping up the pools of blood from the injuries to this child." *Id.* at 4432.

Explaining her beliefs as to why she had reached an opinion in this case, Juror # 152 wrote, "When the police enter[ed] the Payne home the man (Roy Ward) still had the knife in his hand." *Id.* at 4502.

Other than perfunctory questioning of whether they could be fair and impartial, to which each generally responded "yes", there was no voir dire examination conducted of these jurors to explore their previously expressed belief that Ward was guilty. There was more extensive ques-

---

to suffer, hang him, shoot him, electric chair, gas chamber." *Id.* at 4594; "How can he not be guilty[?]" *Id.* at 5123.

4. One of Ward's claims on appeal is that the trial court abused its discretion by refusing to

dismiss twelve prospective jurors for cause thereby forcing him to exhaust twelve of his twenty peremptory challenges. Because we resolve this case on other grounds, we decline to address this issue.

tioning of Juror # 121. But in the end she was not sure whether she could return a verdict based solely on the evidence presented at trial. The following exchange is instructive:

[Prosecuting Attorney]: [Juror # 121], do you believe that you can set aside what you've heard outside the courtroom or read outside the courtroom and any kind of preconceived ideas or notions that you may have and base your decision on the law and evidence that you hear in this courtroom?

[Juror # 121]: I could follow the Judge's direction on what to do and abide by the law, but I also have an opinion.

[Prosecuting Attorney]: Okay. And I think that's—I would be surprised if people didn't have opinions. That's what we—as a society, we bring our opinions with us in everything we do. We all are creatures of habit, creatures of what we hear, and we have also our own set of individual personal beliefs that we bring to every issue. Do you believe that you could—let me ask it this way. Do you believe that your opinion would keep you from being fair to the Defendant or the State?

[Juror # 121]: It makes it very difficult, and I'm putting myself in that place.

[Prosecuting Attorney]: Okay. I understand.

Tr. at 531–32

[Trial Court]: Are you willing to lay aside anything you may have seen or heard about this case and hold the State of Indiana to a burden of proof to [prove] beyond a reasonable doubt of each and every element of each and every crime charged and base a decision solely on what you hear and see in this courtroom[?]

. . .

[Juror # 121]: It's—I don't know; it's just hearsay from maybe what's in the paper, but I know that, other than just knowing what was on the paper—in the paper and on TV and having two daughters of my own and he was at the scene with the weapon I feel like would [sic] be very difficult for me to change my mind.

*Id.* at 585–86.

With the twelve jurors and two alternates thus selected, the guilt phase of trial was held over four days from October 14 through October 18, 2002. Ward did not take the stand in his defense. However during opening statements and closing arguments, counsel conceded that Ward "is responsible for Stacy Payne's death. . . ." *Id.* at 1103, 2627. The contested issues were whether he knowingly or intentionally killed her, raped her, and engaged in criminal deviate conduct. The jury convicted Ward as charged. The penalty phase of trial began October 21, 2002, and the jury returned a recommendation of death. Following a sentencing hearing, the trial court followed the jury's recommendation. The trial court also sentenced Ward to two consecutive fifty-year terms of imprisonment for the rape and criminal deviate conduct convictions. This direct appeal followed in due course.

### Discussion

■■■ "At the heart of the decision on a motion for change of venue is the right to an impartial jury." *Lindsey v. State,* 485 N.E.2d 102, 106 (Ind.1985). This right derives from the Sixth Amendment to the United States Constitution, as applied to the States by the Fourteenth Amendment, as well as Article One, Section Thirteen of the Indiana Constitution. "A fair trial in a fair tribunal is a basic requirement of due process." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). A juror's verdict must be impartial "regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." *Morgan v. Illinois,* 504 U.S. 719, 727, 112

S.Ct. 2222, 119 L.Ed.2d 492 (1992). In essence "the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) (citations omitted).

Ward contends "Because of the Horrible Nature of the Crime, Pretrial Publicity, Prospective Jurors' Knowledge of the Crime and Victim and the Venire's Expressed, Overwhelming Predisposition to Convict, the Court Should Have Moved the Trial from Spencer County, Indiana." Br. of Appellant at 25.

■ We review a trial court's denial of a motion for change of venue for an abuse of discretion. *Specht v. State,* 734 N.E.2d 239, 241 (Ind.2000). An abuse of discretion does not occur where voir dire reveals that the seated panel was able to set aside preconceived notions of guilt and render a verdict based solely on the evidence. *Elsten v. State,* 698 N.E.2d 292, 294 (Ind.1998). The defendant must demonstrate the existence of two distinct elements: (1) prejudicial pretrial publicity and (2) the inability of jurors to render an impartial verdict. *Specht,* 734 N.E.2d at 241; *White v. State,* 687 N.E.2d 178, 179 (Ind.1997). "Prejudicial pretrial publicity is that which contains inflammatory material which would not be admissible at the defendant's trial or contains misstatements or distortions of the evidence given at trial." *Burdine v. State,* 515 N.E.2d 1085, 1092 (Ind.1987).

In this case the news reports were extensive, detailed and graphic. However they were largely accurate accounts of a horrific and brutal killing. On the other hand several of the news articles recounted Ward's criminal history. *See supra* n. 2. In that regard the articles contained inflammatory, inadmissible information. Thus, Ward has established the existence of prejudicial pretrial publicity. We ac-

knowledge however that the prejudicial nature of the pretrial publicity is only marginally at issue here. Without regard to press accounts of Ward's criminal past, the critical inquiry is whether overall community bias and prejudice exist such that Ward was denied a fair trial. *See Lindsey,* 485 N.E.2d at 106. In other words even if Ward had no criminal history or if that history had not been reported, we nonetheless would be confronted with the question of whether jurors were able to render an impartial verdict. *White,* 687 N.E.2d at 179.

■ It is not a prerequisite to a fair trial that the jurors be totally ignorant of the facts involved. *Smith v. State,* 465 N.E.2d 1105, 1116 (Ind.1984). Thus, a juror's mere exposure to press coverage is not enough to support a claim that local prejudice entitles a defendant to a change of venue. Even if potential jurors have been exposed to pretrial publicity concerning the defendant's case that alone is insufficient to establish prejudice unless the defendant can also demonstrate that the jurors were unable to set aside any preconceived notions of guilt and render a verdict based on the evidence. *Johnson v. State,* 472 N.E.2d 892, 906 (Ind.1985); *see also* Ind.Code § 35–37–1–5(b) (providing that prospective juror may be allowed to serve despite existence of preconceived notions of guilt stemming from pretrial publicity, so long as the juror states and the court concludes that the juror can render a verdict based upon the law and the evidence presented). Essentially, in order to obtain a change of venue the defendant bears the burden of showing that community prejudice exists which would prevent the defendant from obtaining a fair trial in that community. *Clemens v. State,* 610 N.E.2d 236, 240 (Ind.1993).

■ In this case the pattern of deep and bitter hostility shown to be present

throughout the community was clearly reflected in the juror questionnaires. In addition, six of the twelve jurors finally seated expressed the belief that Ward was guilty. We do not doubt the sincerity of the jurors who said they could set aside their preconceived beliefs and render a verdict based on the evidence. Indeed there is a presumption that the juror's voir dire is truthful. *Brown v. State*, 563 N.E.2d 103, 105 (Ind.1990). However, this presumption can be overcome by a showing of a general atmosphere of prejudice throughout the community. *Id.* As expressed by the United States Supreme Court:

> In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.

*Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The record establishes that the presumption has been overcome in this case. Even more disturbing, however, one juror candidly and honestly admitted "I don't know" when asked by the trial court whether she was willing to base a decision solely on the evidence presented at trial. Tr. at 584. Having previously expressed the belief that Ward was guilty this juror said she felt that "it would be very difficult for me to change my mind." *Id.* This juror's view alone requires that we grant Ward a new trial. "If even one [partial] juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence." *State v. Dye*, 784 N.E.2d 469, 476 (Ind.2003) (quoting *Morgan*, 504 U.S. at 729, 112 S.Ct. 2222). With his life at stake, we think the Constitution requires that the defendant "be tried in an atmosphere undisturbed by so huge a wave of public passion and by a jury other than one in which [one half] of the members admit, before hearing any testimony, to possessing a belief in his guilt." *Irvin*, 366 U.S. at 728, 81 S.Ct. 1639. We conclude therefore that the trial court abused its discretion in failing to grant Ward's motion for change of venue from the county, or in the alternative to draw the jury from another county. Accordingly, we reverse the trial court on this issue and remand this cause for a new trial.

Judgment reversed and cause remanded.

SHEPARD, C.J., and DICKSON, SULLIVAN and BOEHM, JJ., concur.