

IN THE

# Indiana Supreme Court

Supreme Court Case No. 23S-LW-244

## Chelsea L. Crossland,

*Appellant,*



FILED

Apr 23 2025, 9:07 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

–v–

## State of Indiana,

*Appellee.*

Argued: March 6, 2025 | Decided: April 23, 2025

Direct appeal from the Jay Circuit Court
No. 38C01-2203-MR-2
The Honorable Brian D. Hutchison, Judge

**Opinion by Justice Slaughter**

Chief Justice Rush and Justices Massa, Goff, and Molter concur.

**Slaughter, Justice.**

A jury convicted Chelsea L. Crossland of murder and neglect of a dependent resulting in death. It then recommended an LWOP, life-without-parole, sentence, which the trial court imposed. On direct appeal, Crossland urges us to overturn her conviction, alleging she was denied her constitutional rights to an impartial jury and to present a complete defense. We affirm.

## I

### A

The victim in this case is Christian Crossland, the defendant's five-year-old son. Christian lived with a friend of his mother from the time he was two years old until he turned five. Then in January 2022, he went to live with his mother and his four siblings; all five children were under ten years of age. This is when Crossland began neglecting and abusing Christian.

Crossland confined Christian to her bedroom and made him sleep on the floor of her bedroom closet. She did not let Christian interact or eat with the other children. She let him out of the bedroom only to use the bathroom. One of Christian's sisters speculated that their mother kept him confined "to make sure he was being watched by her . . . . So he didn't like escape or get any food or like go out—outside the closet or anything". Two of the siblings said they never saw Crossland give him food. Both of them would at times sneak Christian food, but only while their mother was sleeping or in the bathroom because doing so was "really risky". In addition to withholding food, Crossland beat Christian "all over" his body using a piece of wood, a belt, and her bare hands.

Christian's siblings gave different explanations for their mother's conduct. One sister said Crossland withheld food from Christian because he "didn't know his ABC's" and "didn't know like how to count to ten". Another sister said Crossland "didn't like him as much" as she liked her other children.

On March 24, 2022, the night Christian died, he was lying in the corner of Crossland's bedroom. His face was red, and he was coughing. One of his sisters, also in the bedroom, saw Christian fall, which she reported to her mother. Crossland took Christian into the bathroom, where she tried to "feed" him shampoo. Crossland eventually called her mother and asked her to come over.

As Crossland waited for her mother, she wrapped Christian's dead body in a blanket and put it in a trash bag. She asked one of her daughters, about eight years old: "Do you think I should call the cops or do you think we should just stay quiet about it"? When Crossland's mother arrived about two hours later, she told Crossland to call an ambulance. Crossland told the dispatcher that Chrisitan died after falling and hitting his head. When paramedics arrived, they found Christian with blood around his face and his "very emaciated" body lying supine on the bathroom floor.

Crossland made conflicting statements to police and paramedics about what happened. First, she told them that Christian had fallen, and that she called 911 as soon as she found him. Then she said she called for help thirty minutes after he fell and tried to revive him with CPR, cardiopulmonary resuscitation. Crossland next said she did not call 911 right away because her phone was dead.

Authorities performed an autopsy as part of their investigation into Christian's death. The autopsy revealed cuts and bruises all over his body, including his genitals and anus. A pathologist reviewed the autopsy report and photographs from the procedure and found no evidence that Christian had received CPR.

Aside from the cuts and bruises, Christian's body was skeletal, weighing a mere twenty pounds. His eyes were recessed, cheeks sunken, and rib cage prominent. The pathologist concluded that Christian died from the combined effects of blunt-force injuries, starvation, and dehydration. A child-abuse pediatrician determined Christian "would've had almost no calories" for nearly 74 days—coinciding with the time Christian moved in with his mother. "With that low of caloric intake", the pediatrician added, "I think it's surprising that he survived that long".

B

The State charged Crossland with murder and neglect of a dependent resulting in death. It sought an LWOP sentence because her victim was under twelve-years-old, and she had tortured him while he was still alive. Ind. Code §§ 35-50-2-9(b)(11)(A), 35-50-2-9(b)(12). During Crossland's trial, two issues arose relevant to this appeal.

First, Crossland took issue with her jury. Shortly after the State brought charges, Crossland moved for a change of venue, arguing that publicity about her case made it impossible to seat an impartial jury. In support, she cited news articles detailing charges against her and other criminal conduct not charged in her murder case. Crossland also attached a screenshot of her personal Facebook page showing hostile comments to her page referencing some of the news articles. After a hearing, the trial court denied her motion. It agreed that the pretrial publicity presented a potential issue but not "until [the parties] try and [e]mpanel a jury."

At the start of voir dire, Crossland again moved for a change of venue. The court deferred ruling on the motion until voir dire concluded. During voir dire, Crossland moved to strike eight prospective jurors for cause. The court denied all but one of these requests, finding seven of the challenged jurors were competent to serve. The State removed one of the remaining seven jurors with a peremptory challenge. Crossland removed the remaining six jurors peremptorily. Because she used all her peremptory challenges on these jurors, she could not remove another juror, S.B., whom she argues on appeal was objectionable. After the jury was seated, the court denied Crossland's renewed request for a change of venue.

Second, Crossland took issue with one of her witnesses, Nicholas Riddle, her on-and-off boyfriend and the father of two of her children. Crossland called Riddle to the stand to prove that he was around Christian the week before Christian died. Riddle testified he attended a birthday party at Crossland's apartment in the weeks before Christian died. But Riddle said he did not see Christian. Riddle also testified he was unsure whether he was at the apartment on March 23, the day before the boy died.

To impeach Riddle's testimony, Crossland tried to admit as evidence an email exchange between herself and Riddle. The State objected on hearsay grounds, which the court did not address on the record. But after an untranscribed sidebar, Crossland questioned Riddle about other topics. Crossland next asked about Riddle's statements to police on his whereabouts. The State again objected on hearsay grounds, which the trial court sustained. Last, Crossland called a caseworker from DCS, the Indiana Department of Child Services. Crossland tried to admit a written report by a different DCS caseworker recounting that Riddle said he was at Crossland's house the day before Christian died and that Christian "was fine at that time". The State again objected on hearsay grounds, and after another untranscribed sidebar, Crossland stopped questioning the caseworker.

The jury found Crossland guilty. The trial court, citing double-jeopardy concerns, entered a judgment of conviction on the murder charge alone. The jury found beyond a reasonable doubt the State's two aggravating circumstances: that Crossland's victim was younger than twelve years old, and that Crossland had tortured him. The jury recommended an LWOP sentence, which the trial court imposed.

Crossland then appealed directly to us. We have mandatory, exclusive jurisdiction over criminal appeals in which the trial court imposes an LWOP sentence under Indiana Code section 35-50-2-9. Ind. Appellate Rule 4(A)(1)(a). On appeal, Crossland challenges only her conviction, not her sentence.

## II

Crossland challenges her murder conviction on two grounds: first, the trial court denied her an impartial jury; second, the trial court violated her constitutional right to present a complete defense. We consider each argument in turn and conclude both lack merit.

## A

Crossland first argues she was not tried by an impartial jury. The United States and Indiana constitutions enshrine the right to an impartial jury. *Oswalt v. State*, 19 N.E.3d 241, 245 (Ind. 2014). To be impartial, a juror need not be "totally ignorant of the facts or issues involved in a case".

*Whiting v. State*, 969 N.E.2d 24, 28 (Ind. 2012). Instead, an impartial juror need only be "able and willing to lay aside his or her prior knowledge and opinions, follow the law as instructed by the trial judge, and render a verdict based solely on the evidence presented in court." *Ibid.*

Crossland argues her right to an impartial jury was infringed in two ways. First, she argues negative pretrial publicity poisoned the jury pool, thus requiring that she be tried in a different venue. This argument fails because, despite the negative pretrial publicity, there is no evidence the jury was unable to render an impartial verdict. Second, she argues she should have been able to peremptorily challenge a prospective juror she found objectionable, S.B., who sat on her jury. This argument fails because Crossland was not owed another peremptory challenge to use against S.B.

1

We begin with Crossland's objection to venue. We review the denial of Crossland's motion to change venue for an abuse of discretion. *Specht v. State*, 734 N.E.2d 239, 241 (Ind. 2000). To prove she was owed a different venue, Crossland had to show: (1) there was prejudicial pretrial publicity about her case, and (2) at least one juror on her panel was unable to render an impartial verdict due to pretrial publicity. *Ward v. State*, 810 N.E.2d 1042, 1049, 1050 (Ind. 2004). She also had to exhaust her peremptory challenges, *Bixler v. State*, 471 N.E.2d 1093, 1100 (Ind. 1984) (requiring exhaustion to litigate change of venue on appeal), which she did.

Starting with the first element, everyone agrees there was prejudicial pretrial publicity in the venue where Crossland was tried. "Prejudicial pretrial publicity is that which contains inflammatory material which would not be admissible at the defendant's trial or contains misstatements or distortions of the evidence given at trial." *Ward*, 810 N.E.2d at 1049. As the State recounted, "local news articles reported on Crossland's criminal history and that one of her daughters told police Crossland sexually abused her for two years", which is "both inflammatory and inadmissible at Crossland's trial."

To meet her burden on the second element, Crossland had to present "evidence in the record showing that jurors were unable to be impartial

due to the pretrial media coverage." *Specht*, 734 N.E.2d at 241. Yet Crossland pointed to no such evidence. She identified not a single juror seated on her panel who was exposed to pretrial publicity. "As we have held in many prior decisions, this [omission] is fatal to [the defendant's] claim." *Ibid*.

Despite Crossland's omission, our own review of the record shows that three jurors from her trial said during voir dire that they had been exposed to pretrial publicity: J.H., J.L., and V.D. But the mere fact these three jurors were exposed to pretrial publicity does not require a new trial in a new venue. So long as they were "able to set aside preconceived notions of guilt and render a verdict based solely on the evidence", no new trial is required. *Elsten v. State*, 698 N.E.2d 292, 294 (Ind. 1998).

All three jurors agreed to judge Crossland impartially despite their exposure to prejudicial pretrial publicity. J.H. agreed to presume Crossland innocent until proven guilty and to hold the State to its burden to prove Crossland's guilt beyond a reasonable doubt. J.L. agreed to set aside "entirely" what she learned from pretrial publicity and decide the case based only on the evidence at trial. And V.D. agreed to set aside what she had learned from the media, hold the State to its burden of proof, and presume that Crossland is innocent until proven guilty.

We must presume these prospective jurors were truthful during voir dire, followed the court's instructions, and judged Crossland based only on the evidence adduced at trial. *Ward*, 810 N.E.2d at 1050. Of course, "a general atmosphere of prejudice throughout the community" may overcome this presumption. *Ibid.* But Crossland's case is a far cry from those truly rare cases where a community's bias was so strong as to leave jurors unable to render an impartial verdict.

Consider *Ward v. State*. There, the defendant was accused of a gruesome stabbing. *Id.* at 1045. News articles detailed the crime's brutality and the defendant's extensive criminal history. *Id*. at 1049. During a two-day voir dire, 84 of the 122 potential jurors answered their questionnaire by suggesting they had prejudged the defendant's guilt. *Id*. at 1046. Eleven of the seated jurors had heard or read about the case. *Id.* at 1047. Six of them said they already prejudged the defendant's guilt. *Ibid.* One seated juror

even suggested she would be unable to change her mind about the defendant's guilt. *Id.* at 1050. Given this "pattern of deep and bitter hostility" toward the defendant, *id.* at 1049, we reversed, holding the trial court abused its discretion in failing to order a "change of venue from the county, or in the alternative to draw the jury from another county", *id.* at 1050.

Here, in contrast, evidence that some jurors were exposed to some pretrial publicity about Crossland's case comes nowhere near the facts of *Ward*. Crossland points to no evidence of community-level bias against her, and we have found none. And during voir dire, the State remedied any initial concern about juror bias by rehabilitating the disputed jurors. The trial court did not abuse its discretion in denying Crossland's motion to change venue.

2

Aside from pretrial publicity, Crossland also argues the trial court denied her an impartial jury by depriving her of a peremptory challenge. Understanding her argument requires us to explain the difference between a prospective juror who is incompetent and one who is merely objectionable.

An "incompetent" juror cannot serve. See *Oswalt*, 19 N.E.3d at 246. A juror is incompetent and constitutionally ineligible to serve if her "views would prevent or substantially impair" her ability to be impartial. *Ibid.* (cleaned up). Put differently, a juror is incompetent if she is biased. *Whiting*, 969 N.E.2d at 28. Both our criminal code and our jury rules outline scenarios when a juror is incompetent and cannot serve. I.C. § 35-37-1-5; Ind. Jury Rule 17. A juror who is incompetent—constitutionally, by statute, or under the jury rules—must be removed "for cause", even on the court's own motion. *Whiting*, 969 N.E.2d at 29. A party who believes a juror is incompetent may lodge a for-cause motion to strike. *Oswalt*, 19 N.E.3d at 246. We review a trial court's decision on a for-cause motion for an abuse of discretion and reverse "only if the decision is illogical or arbitrary." *Id.* at 245.

An objectionable juror, in contrast, is not foreclosed from sitting (and thus cannot be excluded for cause) but may be struck, if at all, with a "peremptory" challenge. Though parties have no constitutional right to peremptory challenges, *Whiting*, 969 N.E.2d at 29, state law and our jury rules give parties a limited number of peremptory challenges. I.C. § 35-37-1-3; Ind. J. R. 18. A peremptory challenge is a "nearly unqualified right to remove any prospective juror . . . restricted only by the parties' finite allotment of challenges and the constitutional ban on racial, gender, and religious discrimination." *Oswalt*, 19 N.E.3d at 246. If a party has no more peremptory challenges to remove an objectionable juror because she used all her challenges to exclude incompetent jurors the court should have struck for cause, we will reverse and order a new trial. *Id.* at 249.

Crossland argues she should have been able to peremptorily challenge S.B. because she found him objectionable. But, she says, the trial court robbed her of this challenge by forcing her to exhaust all her challenges on six incompetent jurors the court should have struck for cause. To win her argument, Crossland must prove at least one of these six jurors was truly incompetent—biased—and not merely objectionable. She must also show that she exhausted all her peremptory challenges, *id.* at 246 (requiring exhaustion of peremptory challenges to preserve issue of juror competence on appeal), which she did.

We reject Crossland's argument. Not one of the six prospective jurors she complains of was incompetent. All prospective jurors who initially expressed reservations were rehabilitated through additional questioning. *Id.* at 250 (finding juror rehabilitated after affirming he would follow the court's instructions, listen to the evidence, and decide the case based only on the instructions and evidence). Thus, contrary to Crossland's claim, the trial court did not "force" her to use her peremptory challenges at the expense of removing S.B.

**K.C.** Crossland argues the trial court should have removed K.C., who had a vacation scheduled for part of the week of trial. During voir dire, K.C. suggested that, as trial went on, he might "[t]o some degree" become distracted and hope trial proceedings would not bleed into his vacation time. K.C. was not incompetent for two reasons. First, Crossland cites no

case holding that a prospective juror is per se incompetent because he suggested he might be distracted. An inattentive juror might violate the constitutional right to a fair trial. *Warren v. State,* 757 N.E.2d 995, 1001 (Ind. 2001). But this claim arises only when a seated juror was truly inattentive. "To prevail on a claim of juror misconduct through inattentiveness, the defendant must demonstrate that the juror was actually inattentive and that the juror's inattention resulted in actual prejudice." *Ibid.* So while a juror's **actual** inattentiveness during trial may present a constitutional problem, the fear that a prospective juror **might** be inattentive does not render the potential juror incompetent. Second, K.C. was rehabilitated. He affirmed during voir dire that he would not rush jury deliberations to make his vacation, even if he alone believed Crossland was not guilty.

**K.E.** Crossland's argument about another prospective juror, K.E., fails for similar reasons. K.E. suffered from PTSD, post-traumatic stress disorder. During voir dire, he said that photographic evidence of Christian's starved body might trigger his PTSD, which could cause him to "zone out" and make it hard to pay attention to the evidence. Given the risk that K.E.'s triggered PTSD might distract him from trial, Crossland asserts he was incompetent. But, again, the mere risk that a prospective juror might become inattentive during trial is not cause to remove him as incompetent.

**K.L.** Crossland raises a different argument about K.L. She says that he, as a father to young children, should have been struck because the evidence at trial might have "inflame[d]" his paternal instincts such that "he could not be fair and impartial." To be sure, K.L. said his strong feelings for his children might affect him. But this does not automatically render him incompetent. In *Oswalt*, a juror expressed "discomfort at the thought of trying a child-molestation case" and went so far as to say that he would not want "a juror like himself adjudicating [his own] case." 19 N.E.3d at 249–50. But we held the juror was competent after he reiterated he would decide the case based only on the evidence and the court's instructions. *Id.* at 250. The same goes for K.L. He said he would presume Crossland was innocent, determine her guilt "based on the evidence", and hold the State to its burden of proof.

**E.P.** Crossland argues that E.P. was incompetent because he had been exposed to pretrial publicity—via newspaper and radio—and said he might be "[s]omewhat" biased against Crossland given the charges against her. But both the prosecutor and defense counsel rehabilitated E.P., who clarified that he would follow the court's instructions, presume Crossland was innocent until proven guilty, and decide the case based only on the evidence at trial.

**V.W.** Crossland argues that V.W. was incompetent because she grew up in an abusive household and, Crossland claims, "definitively stated that she could not lay aside her bias and prejudice against Crossland". The voir dire transcript tells a more nuanced story. Though V.W. said her personal experience "could" affect her decision making, she made clear that she had not formed an opinion about Crossland's guilt because she had yet to hear the evidence. She also said she would presume Crossland was innocent, hold the State to its burden of proof, and follow the court's instructions.

**D.Z.** Crossland challenges D.Z. for reasons like those of K.L. and V.W. Crossland claims D.Z. was incompetent because he has two young children and grew up in an abusive home. D.Z. too was rehabilitated. He agreed to follow the court's instructions, presume Crossland is innocent, and hold the State to its burden of proof.

Not one of these prospective jurors was incompetent. Crossland's choice to exclude them as objectionable was her prerogative. But the trial court did not force Crossland to use her peremptory challenges at the expense of striking S.B.

B

Crossland's second argument for overturning her murder conviction concerns her witness, Riddle. She claims the trial court "committed reversible error in denying [her] the ability to impeach" Riddle, whom she describes as "a witness essential to her case." Excluding impeachment evidence, she asserts, infringed her federal constitutional right to present a defense under the due process clause of the Fourteenth Amendment and

the compulsory-process and confrontation clauses of the Sixth Amendment.

The trial court did not err because the constitution does not give Crossland an unlimited right to introduce whatever evidence she wants. Besides, on this record, any error in excluding this evidence was harmless. Evidence of Crossland's guilt was overwhelming, and the excluded out-of-court statements by Riddle would not have created reasonable doubt of Crossland's guilt.

1

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Kubsch v. State*, 784 N.E.2d 905, 923–24 (Ind. 2003) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). The right to present a complete defense includes the right to "offer the testimony of witnesses", "present the defendant's version of the facts", and use the defendant's "own witnesses to establish a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). These protections are "a fundamental element of due process of law." *Ibid.* Crossland does not argue the trial court erred in excluding the testimony as inadmissible hearsay under our evidence rules. Rather, she claims the constitution required the trial court to admit the impeachment evidence because Riddle's testimony was key to her defense.

The constitution does not go as far as Crossland suggests. The right to present a complete defense is not absolute. A defendant must comply with the rules of evidence in presenting her case "to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). The constitution gives trial judges "wide latitude" to exclude evidence under these rules. *Crane*, 476 U.S. at 689–90. And it is constitutional "to exclude evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability". *Id.* at 690. Our trial rules exclude most hearsay statements—out-of-court statements offered at trial for their truth—because their reliability cannot be tested through a trial's adversarial process. *Mason v. State*, 689

N.E.2d 1233, 1236 (Ind. 1997). "The principal reasons to exclude hearsay evidence" are "that the out-of-court declarant is not under oath, is not subject to confrontation by the trier of fact, and is not subject to cross-examination by the accused." *Ibid.* The trial court excluded Crossland's proposed impeachment evidence of Riddle because of its hearsay nature. Doing so did not violate her constitutional rights. *Crane*, 476 U.S. at 690.

2

Moreover, even were we to credit Crossland's argument that the exclusion of this testimony was erroneous, we need not reverse on this record because the alleged constitutional error "was harmless beyond a reasonable doubt". *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986); see *Rawley v. State*, 724 N.E.2d 1087, 1090–91 (Ind. 2000) (finding harmless error given overwhelming evidence of guilt).

Riddle's out-of-court statements would not have created a reasonable doubt of Crossland's guilt. Crossland claims Riddle told others he was at Crossland's home just before Christian died. Had she been able to "properly impeach Mr. Riddle on his claim that he was not at her home the day before Christian passed," Crossland contends, "the jury might well have wondered why he would lie about such a thing, unless he had something to hide." Yet Crossland does not allege Riddle participated in starving or beating Christian, or that he even knew of Christian's suffering. She asserts only that Riddle's inconsistent statements about his whereabouts mean the State could not prove beyond a reasonable doubt that she murdered Christian. This conclusion does not follow from the proposed evidence. At most, the excluded testimony suggests Riddle knew of Crossland's neglect and abuse of Christian but did not stop her. This testimony, even if the jury heard and believed it, would not exculpate Crossland.

Indeed, overwhelming evidence supports Crossland's guilt. The evidence shows that Christian died after his mother beat him, confined him to her bedroom, made him sleep on her closet floor, let him out only to use the bathroom, did not feed him herself, and did not allow her other children to feed him. When Christian died, his withered body weighed twenty pounds, leading a doctor to conclude he had gone without food

for 74 days before succumbing. There is no reasonable doubt that Crossland murdered Christian.

*     *     *

For these reasons, we affirm the trial court's judgment.

Rush, C.J., and Massa, Goff, and Molter, JJ., concur.

ATTORNEY FOR APPELLANT CHELSEA L. CROSSLAND
Samuel J. Beasley
Beasley Law Office
Muncie, Indiana

ATTORNEYS FOR APPELLEE STATE OF INDIANA
Theodore E. Rokita
Attorney General of Indiana

Tyler Banks
Andrew A. Kobe
Deputy Attorneys General
Indianapolis, Indiana